**KIRBY LAKE DEVELOPMENT, LTD., Miter Development Co., L.L.C., Taylor Lake, Ltd., and Friendswood Development Co., Ltd., Petitioners,**

v.

**CLEAR LAKE CITY WATER AUTHORITY, Respondent.**

No. 08–1003.

Supreme Court of Texas.

Argued Jan. 19, 2010.

Decided Aug. 27, 2010.

Lawrence J. Fossi, Karen B. Jewell, Fossi & Jewell, LLP, Houston, TX, for petitioners.

Ramon G. Viada III, Viada & Strayer, The Woodlands, TX, Barry Abrams, Abrams, Scott & Bickley, LLP, William E. Schweinle Jr., Schweinle, Parish & Lowerre, P.C., Houston, TX, for respondent.

Murry B. Cohen, Akin Gump Strauss Hauer & Feld LLP, Houston, TX, Laura F. Hill, Texas Municipal League, Austin, TX, for amicus curiae.

Chief Justice JEFFERSON delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, and Justice LEHRMANN joined, and in which Justice WILLETT joined as to all parts except footnote 7.

Water lies beneath the surface of today's case, yet our holding is based on a rule of grammar, not capture. The Water Authority must seek voter approval, "in any bond election" it conducts, to sell bonds so that developers—who fronted the cost of the city's water and sewer lines—can be reimbursed. Does "any" bond election mean "every" bond election? Or has the Authority satisfied its obligation by approving the reimbursement proposal in at least one election, even if voters reject the measure? We hold that, in the context of these Agreements, "any" means "every." Our answer to that question, however, matters little unless the Authority is amenable to suit. We hold that it is. When a Water Authority enters into a contract like the one here, it may be sued for failing to fulfill the contract's terms. *See* Tex. Loc. Gov't Code § 271.152. The Authority's refusal to include a reimbursement measure in every bond election constituted a breach of its contracts with the Developers. Because the Legislature has waived the Authority's immunity from suit for that breach, we reverse in part the court of appeals' judgment and remand the case to that court to consider the Authority's remaining issues. Because we agree with the court of appeals that the Authority's actions did not rise to the level of a taking, we affirm that part of the court of appeals' judgment.

## I. Background

Petitioners are residential developers in the Clear Lake area of greater Houston.[1] Each entered into contracts entitled "Sales Agreement and Lease of Facilities" with the Clear Lake City Water Authority.[2] The Agreements stipulated that the Developers would build water and sewer facilities according to the Authority's specifications, and that the Developers would lease the facilities to the Authority free of charge until the Authority purchased them. The Authority agreed to reimburse the Developers for 70% of their construc-

---

1. They are: *Kirby Lake Development, Ltd.,* Miter Development Company, L.L.C., Taylor Lake, Ltd., and Friendswood Development Company, Ltd. ("Developers").

2. Taylor Lake, Ltd. entered into two of these contracts, four years apart, because the Au- thority was not immediately able to annex a portion of the property that Taylor Lake sought to develop. *Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.,* 123 S.W.3d 735, 740 n. 1 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

tion costs once it received voter-approved bond funds. The Authority was not obligated to reimburse the Developers until a bond sale was approved in an election.

The Agreements contain the following pertinent clauses:

Subject to other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds legally available and allocated by the Authority for payment therefore....

*It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs without a voter approved bond sale for such purchase. The Authority intends to call a bond election in the near future but is not obligated to do so, and the Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities. The Authority shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so. The Authority does agree, however, that it shall include in any bond election it does hold subsequent to the effective date of this Agreement bond authorization in an amount sufficient to pay the purchase price of the Facilities?* [3]

. . . .

The Authority shall have no obligation to obtain approval from the voters of bonds to finance purchase of the Facilities, but if such voter approval is obtained, the Authority shall sell Authority bonds for the purpose of purchasing the Facilities.... The Authority agrees to proceed with due diligence to consummate the issuance of such bonds and the acquisition of the Facilities under such circumstances.

In May 1998, as stipulated by the Agreements, the Authority placed a bond authorization measure on the next election ballot. Voters rejected the measure. In October 1998, the Authority again placed a bond measure on the ballot, this time separating it into two parts: a proposal to reimburse the Developers, and another to fund the maintenance of a separate water treatment plant the Authority owned. The voters passed the second proposal but rejected the first. Three of the four Developers (Kirby Lake, Miter, and Taylor Lake) then sued the Authority, alleging that it was obligated to reimburse them anyway. A jury found for the Developers, and the trial court rendered judgment in accordance with that verdict. *Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 741–42 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (*"Kirby Lake I"*). The court of appeals reversed, holding that voter approval was a condition precedent to the Authority's purchase obligation. *Id.* at 756.

The Authority held another bond election in September 2004. This time it omitted the Developers' reimbursement proposition altogether, citing the

language of the opinion rendered by the Fourteenth Court of Appeals ..., which expressly stated that certain of the Developers' contracts merely required "that the developers be included in any subsequent election, and they were"—

---

**3.** This section appears in bold and italics in all but one of the Agreements.

confirming that any obligation to seek voter approval to issue bonds to reimburse [the Developers] has already been satisfied.

The Developers sued again, alleging that the Authority breached its agreement to include a reimbursement provision in each bond election.[4] On motion for summary judgment, the trial court concluded that the Authority breached the agreement and awarded damages. 274 S.W.3d 41, 42 ("*Kirby Lake II*"). The court of appeals rejected the Authority's argument that it was immune from suit, holding that Local Government Code section 271.152 waived the Authority's immunity. *Id.* at 44 (citing *Friendswood I,* 256 S.W.3d at 751). Nonetheless, the court of appeals reversed the trial court's judgment, holding that the Authority complied with the contract because "the balance of the paragraph [in the Agreements] clearly indicates that only one election was contemplated.... We therefore find the agreement to be unambiguous in obligating the Water Authority to place the measure only on the next ballot after the effective date of the agreement." *Id.* at 46.

Kirby, Miter, and Taylor also alleged that the Authority's continued possession of the facilities constituted a taking. 2008 Tex.App. LEXIS 5887, at *1("Kirby Lake III").[5] The Authority then filed a plea to the jurisdiction, arguing, among other things, that Kirby, Miter, and Taylor consented to the alleged taking. *Id.* at *2. The trial court granted the plea and dismissed the takings claim for lack of jurisdiction. *Id.* The court of appeals agreed, finding that the Developers had consented

to the Authority's possession of the facilities—barring an inverse condemnation claim. *Id.* at * 13. Each of these cases was decided by a different panel of the same court of appeals.

In November 2006, while the above cases were pending in the trial court, the Authority held another bond election that called for reimbursing the Developers. The 2006 election proved more contentious than its predecessors. The Authority's board members—including members who had signed the original contracts—actively discouraged passage of the measures. A front-page article in the local paper quoted board members as opposing the bonds. An Authority Newsletter denied any obligation to conduct future bond elections, but said "[n]evertheless, the Board finds it appropriate at this time to submit the issue to the voters for a third time, so that the will of the people, which is an express condition of the contracts, can be heard." The bond measures failed—an outcome that the Developers claim would not have occurred absent the Authority's intermeddling.

We consolidated *Friendswood II, Kirby Lake II,* and *Kirby Lake III, Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 52 Tex. Sup.Ct. J. 788, 788–89 (May 29, 2009), and granted the petition for review, *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 53 Tex. Sup.Ct. J. 15, 15 (Oct. 23, 2009). The Developers maintain that the court of appeals erred in holding that "any bond election" meant only one election. They also allege that the Authority's perpetual use of the property without compensation constitutes inverse condem-

---

4. Friendswood Development sued separately from the other developers. 2008 Tex.App. LEXIS 9127, at *1 ("*Friendswood II* ").

5. That claim, initially part of *Kirby Lake II,* had to be refiled in the Harris County Civil Court at Law. *See* TEX. GOV'T CODE

§ 25.1032(c) ("A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, regardless of the amount in controversy.").

nation. The Authority argues, among other things, that neither section 49.066 of the Water Code nor section 271.152 of the Local Government Code waives its immunity, and that it has fully satisfied its obligations under the Agreements.

## II. An Overview of Water Management in Texas

### A. History

Texas' first venture into water regulation stemmed from the state's need to irrigate its driest regions. *See generally* F. Joyce Cox, *The Texas Board of Water Engineers*, 7 TEX. L.REV. 86, 86 (1928–1929) ("In Texas, as elsewhere, administrative control of water resources came in answer to a need."). In 1889, the Legislature enacted a bill for "the arid districts of Texas." *See* Act of March 19, 1889, 21st Leg., ch. 88, 1889 Tex. Gen. Laws 100, 100. The goal was to charter corporations that would build an infrastructure to furnish "water to all persons ... for irrigation and domestic uses." *Id.; see also Ward County Irrigation Dist. No. 1 v. Red Bluff Water Power Control Dist.*, 170 S.W.3d 696, 700 (Tex.App.-El Paso 2005, no pet.). Fifteen years later, Texans approved a constitutional amendment permitting local governments to issue bonds for water development. TEX. CONST. art. III, § 52(b)(2).

Texas voters ratified another water-related amendment in 1917. *See* TEX. CONST. art. XVI, § 59. The amendment created "conservation and reclamation districts" as units of local government, and made the preservation of natural resources a public right and duty. *Id.* § 59(a), (b); *see also Dallas County Levee Dist. No. 2 v. Looney*, 109 Tex. 326, 207 S.W. 310, 310 (1918). As with prior amendments, financing was instrumental to water-resource management. In that respect, the amendment permitted "all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment," as long as "such proposition shall first be submitted to the qualified ... voters of such district and the proposition adopted." TEX. CONST. art. XVI, § 59(c).

Along with the development of conservation districts came the Legislature's codification of state water law. *See* TEX. WATER CODE § 1.003 (declaring "the public policy of the state to provide for the conservation and development of the state's natural resources"). Chapters 49 and 51 of the Water Code govern "water control and improvement districts" ("WCIDs"), like Clear Lake City Water Authority. Chapter 49 provides a blueprint for creating and operating general law water districts, and for financing the significant work required to conserve water resources. *See id.* § 49.211(b). Chapter 51 deals with WCIDs. *See id.* § 51.121. WCIDs have broad authority to "supply and store water for domestic, commercial, and industrial use; to operate sanitary wastewater systems; and to provide irrigation, drainage, and water quality services." TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, TEXAS WATER DISTRICTS: A GENERAL GUIDE 2 (2004), available at http://www.tceq.state.tx.us/files/gi–043.pdf_4419598.pdf (all Internet materials as visited August 25, 2010 and available in Clerk of Court's file).

WCIDs are one of thirteen different types of general law water districts acting as state political subdivisions. *See* TEX. WATER CODE § 50–68; Bonnie M. Stepleton, Note, *Texas Groundwater Legislation: Conservation of Groundwater or Drought by Process*, 26 NAT. RESOURCES J. 871, 874 (1986). WCIDs may consist of a single county or multiple counties. *See* Dick Smith, *Water Control and Improvement Districts*, 6 THE NEW HANDBOOK OF TEXAS 840 (1996). Because WCIDs have

extensive power to regulate domestic and commercial water supply, they have become "the main financing mechanism for development in urban areas." Stepleton, 26 NAT. RESOURCES J. at 875.

### B. Clear Lake City Water Authority

The Clear Lake City Water Authority was created in 1963. *See* Act of May 6, 1963, 58th Leg., H.B. No. 1003, R.S., ch. 101, 1963 Tex. Gen. Laws 164, 173. The Authority occupies the Clear Lake area in Harris County, approximately 20 miles southeast of downtown Houston. CLEAR LAKE CITY WATER AUTHORITY, GENERAL INFORMATION (2010), http://clcwa.org/generalinfo.htm. It is currently Texas' largest water district, encompassing over 16,000 acres, with around 84,000 residents. *Id.*

Water districts frequently contract with private developers to build and maintain water facilities. "Prefunding agreements," like the ones at issue here, are governed by the Texas Commission on Environmental Quality's ("TCEQ") rules. *See Malcomson Rd. Util. Dist. v. Newsom*, 171 S.W.3d 257, 274 n. 11 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); 30 TEX. ADMIN. CODE § 293.46. These agreements allow developers to finance facilities "contemplated for purchase by the district" before TCEQ has approved the bond issue, provided certain conditions are met. 30 TEX. ADMIN. CODE § 293.46. The TCEQ rules require developers to pay at least 30% of the costs under such contracts, "to insure the feasibility of the construction projects of such districts." 30 TEX. ADMIN. CODE § 293.47. The rules further provide that "[a] person proceeding with construction of a project prior to its formal approval by the commission shall do so with no assurance that public funds will be authorized for acquiring the facilities." *Id.* § 293.46(6). Thus, the developer who builds the infrastructure assumes the risk that funding will never materialize, and voters determine whether to commit funds for the project.

We turn now to the issues before us.

### III. Government Immunity

 Water Control and Improvement Districts are "valid and existing governmental agencies and bodies politic." *Willacy Cnty. Water Control & Improv. Dist. No. 1 v. Abendroth*, 142 Tex. 320, 177 S.W.2d 936, 937 (Tex.1944) (quotations omitted). As such, they enjoy governmental immunity from suit, unless immunity is expressly waived. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). The Developers argue that both Texas Water Code section 49.066 and Texas Local Government Code section 271.152 waive the Authority's immunity. The court of appeals in the Developers' two contract-based cases held that, while section 49.066 does not waive immunity, section 271.152 does. 2008 Tex.App. LEXIS 9127, at *2 n. 2 (citing *Friendswood I*, 256 S.W.3d at 747 n. 14)[6]; 274 S.W.3d at 44. We agree for the following reasons.

### A. Water Code section 49.066

 Section 49.066(a) provides that "[a] district may sue and be sued in the

---

**6.** The *Friendswood II* court deferred to its prior holding in *Friendswood I* with regard to the issue of immunity. *See* 2008 Tex.App. LEXIS 9127, at *2 ("The issues regarding governmental immunity are the same as those in the prior interlocutory appeal in this case. Absent (1) a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision or (2) an intervening and material change in the statutory law, this court is bound by the prior holding of another panel of this court.") (citations omitted). Assuming without deciding that the issue is before us in *Friendswood II,* we agree with the *Friendswood I* court's determination that immunity is waived.

courts of this state in the name of the district by and through its board. A suit for contract damages may be brought against a district only on a written contract of the district approved by the district's board." TEX. WATER CODE § 49.066(a). As we explained in *Tooke v. City of Mexia,*

the effect of a "sue and be sued" clause in an organic statute depends on the context in which it is used. The words can mean that immunity is waived, but they can also mean only that a governmental entity, like others, has the capacity to sue and be sued in its own name.

*Tooke v. City of Mexia,* 197 S.W.3d 325, 337 (Tex.2006). Standing alone, then, "sue and be sued" does not plainly waive the Authority's immunity.

The Developers argue that section 49.066 "plainly waives a district's immunity" because it specifies how a district may be served with a lawsuit for contract damages, and delineates the mechanisms for enforcing a judgment against it. *See* TEX. WATER CODE § 49.066(a)-(c). In *Harris County Hospital District v. Tomball Regional Hospital,* we held that a "sue and be sued" statute that specified who would represent the district in civil proceedings was not an indication of legislative intent to waive immunity: instead, the phrase merely "anticipates the district's involvement in civil proceedings of some nature at some point, but it does not address immunity from suit." *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W.3d 838, 843 (Tex.2009).

■ As the court of appeals in *Friendswood II* reasoned, "the Legislature states that a suit for contract damages may be brought against a district only on a written contract of the district approved by the district's board; however, it does not state that all parties to such contracts may sue the district for breach of these contracts or

that immunity from suit as to all such claims is waived." 256 S.W.3d at 743. This interpretation conforms with our holding in *Tooke,* in which we scrutinized similar statutory language providing that the City "may contract and be contracted with, implead and be impleaded in all courts and places and in all matters whatsoever. . . ." *Tooke,* 197 S.W.3d at 344. We explained that "the provision appears to address the capacity of the City to act as a corporate body, not its immunity from suit. All it *clearly* says is that the City can be sued and impleaded in court *when* suit is permitted, not that immunity is waived for all suits." *Id.* Hence, a statute that contemplates a government entity's involvement in litigation does not "clearly and unambiguously waive" the entity's immunity from suit. *See Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 697 (Tex. 2003) ("[A] statute that waives the State's immunity must do so beyond doubt. . . .").

■ The Developers also point to the provision in section 49.066(a) setting forth the "only" conditions under which a contract against a district will be enforceable. *See* TEX. WATER CODE § 49.066(a) ("A suit for contract damages may be brought against a district only on a written contract of the district approved by the district's board."). But such language "does not go as far as waiving immunity from suit, but merely establishes a condition precedent to suit." *Travis County v. Pelzel & Assocs.,* 77 S.W.3d 246, 249 (Tex. 2002); *see also Farmers State Bank of New Boston v. Bowie County,* 127 Tex. 641, 95 S.W.2d 1304, 1306 (1936) ("The language of said article indicates that the rejection by the commissioners' court of a claim against the county, or the failure of such court to act on the same, is merely a condition precedent to the filing of a suit to recover thereon."); *Bexar Metro. Water Dist. v. Educ. and Econ. Dev. Joint Ven-*

*ture,* 220 S.W.3d 25, 31 (Tex.App.-San Antonio 2006, pet. dism'd) ("The language the legislature actually used in amending section 49.066(a) does not 'authorize' a suit against a water district; nor does it expressly waive immunity. Rather, the amendment creates a condition precedent: if a suit for contract damages is otherwise authorized, it may be maintained only if the stated condition is met."). We therefore reject this argument as well.

Since *Tooke,* we have consistently refused to find waivers of immunity implicit in statutory language: there can be no abrogation of governmental immunity without clear and unambiguous language indicating the Legislature's intent do so. *See, e.g., Tomball,* 283 S.W.3d at 842–43; *Lamesa Indep. Sch. Dist. v. Booe,* 235 S.W.3d 710, 711 (Tex.2007); *City of Elsa v. M.A.L.,* 226 S.W.3d 390, 391 (Tex.2007). The present statute is no different. In fact, every court of appeals to interpret section 49.066 after *Tooke* has concluded that the statute does not waive immunity. *See Clear Lake City Water Auth. v. MCR Corp.,* No. 01–08–00955–CV, 2010 WL 1053057, at *4, 2010 Tex.App. LEXIS 2194, at *12 (Tex.App.-Houston [1st Dist.] Mar. 11, 2010, pet. denied); *Jonah Water Special Util. Dist.,* No. 03–06–00626–CV, 2009 WL 2837649, at *2, 2009 Tex.App. LEXIS 7072, at *7 (Tex.App.-Austin, Aug. 31, 2009, no pet.); *Boyer, Inc. v. Trinity River Auth. of Tex.,* 279 S.W.3d 354, 358 (Tex. App.-Fort Worth 2008, pet. denied); *Bexar Metro. Water Dist.,* 220 S.W.3d at 32; *Valley Mun. Util. Dist. No. 2 v. Rancho Viejo, Inc.,* No. 13–07–545–CV, 2008 WL 384320, at *3–4, 2008 Tex.App. LEXIS 1109, at *11 (Tex.App.-Corpus Christi, Feb. 14, 2008, no pet.) (mem.op.). Because section 49.066 does not contain a clear and unambiguous

waiver, the "sue and be sued" language in 49.066(a) does not on its own abrogate governmental immunity.

## B. Local Government Code section 271.152

The Legislature enacted section 271.152 "to loosen the immunity bar so that *all* local governmental entities that have been given or are given the statutory authority to enter into contracts shall not be immune from suits arising from those contracts." *Ben Bolt–Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Property/Casualty Joint Self–Ins. Fund,* 212 S.W.3d 320, 327 (Tex.2006) (quotations omitted).[7] The statute waives immunity from suit for certain contract claims: "A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract...." TEX. LOC. GOV'T CODE § 271.152. The statute defines "contract subject to this subchapter" as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity." *Id.* § 271.151(2).

The Agreements here are written contracts stating their essential terms. The names of the parties, property at issue, and basic obligations are clearly outlined. *See Liberto v. D.F. Stauffer Biscuit Co.,* 441 F.3d 318, 324 (5th Cir.2006) (noting that Texas courts generally construe essential terms of a contract to include "the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be trans-

---

**7.** As supporters of the Bill explained, blanket immunity from breach of contract claims "create[d] a fundamentally unfair situation that denie[d] redress, for example, to a con-

tractor who completed a project for a city that refused to pay." House Research Organization, Bill Analysis, Tex. H.B. 2039, 79th Leg., R.S. (2005).

ferred"); *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex.2000) (noting that a contract is legally binding "if its terms are sufficiently definite to enable a court to understand the parties' obligations"). The relevant inquiry is whether the Agreements entail the provision of "goods or services" to the Authority.

Chapter 271 provides no definition for "services," despite the Legislature's definition of the term in other contexts.[8] It appears, generally, that the term is broad enough to encompass a wide array of activities. *See Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex.1962) ("In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed." (quoting *Creameries of Am. v. Indus. Comm'n*, 98 Utah 571, 102 P.2d 300, 304 (1940))); *but see Berkman v. City of Keene*, 311 S.W.3d 523, 527 (Tex. App.-Waco 2009, pet. denied) ("[T]he statute does not apply to contracts in which the benefit that the local governmental entity would receive is an indirect, attenuated one.") (quotations omitted).

The *Friendswood I* court relied on our analysis in *Ben Bolt* to conclude that the "agreement to hire third parties to construct the Facilities and to build the streets, roads, and bridges is . . . sufficient to constitute the provision of services to the Authority." *Friendswood I*, 256 S.W.3d at 751; *see Ben Bolt*, 212 S.W.3d at 327. In *Ben Bolt*, we liberally construed a government-pooled insurance policy (the "Fund") as encompassing "services" rendered by its members, based on the fact that the Fund's "members elect a governing board, and a board subcommittee resolves claims disputes. To that extent, at least, the Fund's members provide services to the Fund." *Id.* The services provided thus need not be the primary purpose of the agreement. *See Friendswood I*, 256 S.W.3d at 746 n. 13 ("[I]n *Ben Bolt*, the Texas Supreme Court concluded that the Legislature had waived immunity under this statute even though the court concluded that the part of the contract on which the plaintiff based its claim did not involve the provisions of good [sic] or services to the local governmental entity.").

We agree with the court of appeals that the Agreements entail services provided directly to the Authority. The Developers contracted to construct, develop, lease, and bear all risk of loss or damage to the facilities, obligations far more concrete than those at issue in *Ben Bolt*. *Ben Bolt*, 212 S.W.3d at 327. We therefore hold that the Agreements contemplate the provision of services under the statute.

■ The Authority also argues that the Agreements fall outside chapter 271 because there is no "balance due and owed." *See* Tex. Loc. Gov't Code § 271.153(a)(1) (limiting "[t]he total amount of money

---

8. *See, e.g.*, Tex Bus. & Com. Code § 17.45(2) (defining "services" under the Deceptive Trade Practices Act as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods"); Tex. Util. Code § 11.003(19) (defining "service" under the Public Utility Regulatory Act as "any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, and the public"); *see also Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895–96 (Tex.1962) ("Within the meaning of [lien enforcement] statutes . . . and of exemption statutes, 'services' may be rendered though the actual labor . . . performed by one's employees and by means of his machinery or other equipment . . . ." (quoting *Levitt v. Faber*, 64 P.2d 498, 500 (Cal.App.Super 1937))).

awarded in an adjudication brought against a local governmental entity for breach of a contract" to "the balance due and owed by the local governmental entity under the contract."). According to the Authority, because the voters have not approved bonds to buy the facilities, the Developers cannot prove that the amount they seek is "due and owed." At least within the context of these Agreements, we disagree. The purpose of section 271.153 is to limit the amount due by a governmental agency on a contract once liability has been established, not to foreclose the determination of whether liability exists. Furthermore, the Agreements do stipulate the amount of reimbursement owed upon approval of bond funds. The existence of a balance "due and owed" is thus incorporated within the contract—a balance that would come due when voters approve payment in a bond election.

For the above reasons, we agree that section 271.152 waives the Authority's immunity from suit.

## IV. Interpretation of the Agreements

### A. Defining "any"

■ We disagree, however, with the court of appeals' conclusion regarding interpretation of the word "any" in the following contract provision:

The Authority intends to call a bond election in the near future but is not obligated to do so.... The Authority does agree, however, that it shall include in any bond election it does hold subsequent to the effective date of this Agreement bond authorization in an amount sufficient to pay the purchase price of the Facilities.

The Authority says this provision requires the reimbursement measure be placed on one ballot only, upon which it will have fulfilled its contractual obligation. The Developers, on the other hand, contend the provision requires that the Authority place the measure on *every* bond authorization ballot until the end of time, or until the measure is approved. The court of appeals agreed with the Authority, holding that, although the pertinent sentence "could reasonably be interpreted either way, ... the balance of the paragraph clearly indicates that only one election was contemplated." *Kirby Lake II,* 274 S.W.3d at 46.

Texas courts defining "any" have generally interpreted it to mean "every."[9] Those decisions, however, have been so rooted in context that they provide little guidance in this case. *See Texas Co. v. Schriewer,* 38 S.W.2d 141, 144 (Tex.Civ. App.-Waco 1931) ("The word 'any' is a flexible word that may have any one of several meanings according to its use....

9. *See Hime v. City of Galveston,* 268 S.W.2d 543, 545 (Tex.Civ.App.-Waco 1954, writ ref'd n.r.e.) ("[T]he word 'any' has been judicially construed to mean: *'each'* or *'every'* or *'all.'* (Black's Law Dictionary, 3rd Ed., p. 119); and particularly in construing statutes, the word 'any' is equivalent to and has the force of *'every'* and *'all.'* "); *Branham v. Minear,* 199 S.W.2d 841, 846 (Tex.Civ.App.-Eastland 1947, writ ref'd n.r.e.) ("[M]any cases are collated showing that in construing statutes and other instruments 'any' is equivalent to and has force of 'every' or 'all.' ... We think that as found by the learned trial court, 'any minerals' as used in the deed in question, undoubtedly meant 'all minerals.' "); *Doherty v. King,* 183 S.W.2d 1004, 1007 (Tex.Civ.App.-Amarillo 1944, writ dism'd) ("When the word 'any' is used in a plural sense it means 'all,' 'all or every,' 'each,' 'each one of all,' or 'every' without limitation.") (quotations omitted); *Texas Co. v. Schriewer,* 38 S.W.2d 141, 144–45 (Tex.Civ.App.-Waco 1931) ("In its broad, distributive sense, the sense in which the word is very frequently used, it may have the meaning of 'all,' 'every,' 'each,' or 'each one of all.' "), *aff'd in part, rev'd in part sub nom. Smith v. Tex. Co.,* 53 S.W.2d 774 (Tex. Comm'n App.1932).

Its meaning is often restrained, limited, or influenced by the subject-matter or manner in which it is used."), *aff'd in part, rev'd in part sub nom. Smith v. Tex. Co.,* 53 S.W.2d 774 (Tex. Comm'n App.1932). Accordingly, we will examine the Agreements' grammatical structure, in context.

The Authority and the *Kirby Lake II* court point to the use of singular nouns in the succeeding sentence as indicative that "any" means "one time": "The paragraph's first sentence states that the Water Authority 'intends to call *a* bond election' but it cannot predict when or if 'such *an* election ... will occur.' Unlike 'any,' the words 'a' and 'an' are always singular." *Kirby Lake II,* 274 S.W.3d at 46. However, the fact that "a" and "an" are singular does not foreclose interpreting "any" to mean "each" or "one of all"—both of which would require singular antecedents. *See, e.g., Schriewer,* 38 S.W.2d at 145 ("In its broad, distributive sense, the sense in which the word is very frequently used, it may have the meaning of 'all,' 'every,' 'each,' or 'each one of all.' "). The more conventional grammatical meaning of the term, then, suggests that the proposition must be included in every bond election the Authority holds, until the voters approve reimbursement.

Moreover, the Developers argue that the Authority ignores the Agreements' overall structure and purpose, which was to construct facilities that the Authority would ultimately purchase ("Subject to other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all the completed portions of the facilities. . . ."). We agree with the Developers that we must evaluate the overall agreement to determine what purposes the parties had in mind at the time they signed the Agreements. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.,* 267 S.W.3d 20, 23

(Tex.2008) ("Effectuating the parties' expressed intent is our primary concern.").

Section 4.01 provides that the Developer shall lease all operable portions of the facilities to the Authority "without charge *until such time as the Authority acquires such portions;* provided that such lease shall terminate upon the acquisition by the Authority of all the Facilities." (Emphasis added.) Had the parties envisioned only one bond election, they could have easily stated that the Authority may lease the facilities until conclusion of that particular election. Instead, the Agreement permits a continued leasehold "until such time as the Authority acquires [the Facilities]." Moreover, the Agreement is silent as to the parties' obligations in the event the bond measure does not pass. While it expressly acknowledges "that the Authority has no *existing* voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs *without a voter approved bond sale,*" it at no point relinquishes the Authority from its obligation "to include [the bond measure] in any bond election it *does* hold." (Emphases added.)

The *Kirby Lake II* court noted that the Agreement "does not state that a bond measure would be submitted to voters repeatedly until approved." 274 S.W.3d at 46. However, assuming that "any" means "every," such additional language would be superfluous, as the Agreement plainly states that the Authority is to include the measure "in any bond election it does hold." The more blatant omission would be the absence of a provision limiting the Authority's perpetual lease of the facilities without charge in the event the measure does not pass.

Unless the Authority were obligated to submit a measure to reimburse the Developers in each bond election, the Develop-

ers would have essentially forfeited their interest in facilities they built and paid for. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex.2009) ("Forfeitures are not favored in Texas, and contracts are construed to avoid them."). It is unlikely that the Developers intended to convey water and sewer lines as a gift. Because we conclude that the contract, as a whole, contemplates the eventual sale of the Facilities, and because we construe contracts to avoid forfeiture where possible, we hold that the Agreements require the Authority to submit a bond proposal in every bond election it chooses to hold. *See REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 454 (5th Cir. 1991) ("Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way."); *Sheppard v. Avery*, 89 Tex. 301, 34 S.W. 440, 442 (1896) ("A forfeiture of rights of property is not favored by the courts, and laws will be construed to prevent rather than to cause such forfeiture.").

**B. At-will termination of perpetual contracts**

The Authority contends, in the alternative, that the lower court's judgments should be affirmed because the law disfavors perpetual contracts. It is true, as the Authority observes, that the Agreements contain no time limit on its alleged duty to include reimbursement measures in every bond election. We also acknowledge the prospect that voters may never approve such a measure. In *Fort Worth Independent School District v. City of Fort Worth*, 22 S.W.3d at 841, we noted that "contracts which contemplate continuing performance (or successive performances) and which

are indefinite in duration can be terminated at the will of either party" (quotations omitted). Yet the Authority ignores the line of cases that distinguish between contracts of indefinite duration and contracts that specify determinable events. *See generally Trient Partners I Ltd. v. Blockbuster Entertainment Corp.*, 83 F.3d 704 (5th Cir.1996) (applying Texas law); *City of Big Spring v. Bd. of Control*, 404 S.W.2d 810 (Tex.1966).

Where a contract's language specifies a fixed and determinable term, "the rule of law that a contract may be terminated at the end of a reasonable time does not apply." (*Big Spring*, 404 S.W.2d at 816). In *City of Big Spring v. Board of Control*, the City contracted to provide water to a state-run hospital at a prearranged rate for "as long as the State of Texas shall in good faith maintain and operate said hospital." *Big Spring*, 404 S.W.2d at 815. Because this language "fix[ed] an ascertainable fact or event, by which the terms of [the] contract's duration [could] be determined," we held that the contract was not indefinite in duration and therefore not terminable at will. *Id.; see also Fluorine on Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 856 (5th Cir.2004) (applying Texas law). The Agreements here stipulate that both lease of the facilities and the terms of the Agreements themselves terminate upon the Authority's purchase of the facilities (having attained voter-approved bond funds). "Purchase of the Facilities" is an ascertainable event which both parties can identify; the Agreements are thus not terminable at will.[10]

---

10. We note, too, that the Water Code expressly permits water districts to "enter into contracts, which may be of unlimited duration, with ... private entities on the terms and conditions the board may consider desirable, fair, and advantageous for ... the continuing and orderly development of the land and property within the district through the purchase, construction, or installation of works, improvements, facilities, plants, equipment, and appliances...." TEX WATER CODE § 49.213(c)(4).

## C. Reserved Powers Doctrine

 The Authority next argues that, should we interpret the Agreements to impose an ongoing obligation to submit bond proposals in each future election, the Agreements would interfere with substantive government functions, violating the reserved powers doctrine. *See State ex rel. City of Jasper v. Gulf States Utils. Co.,* 144 Tex. 184, 189 S.W.2d 693, 698 (1945). The Authority maintains that "a contract which purports to bind all future boards of directors to include certain propositions in all future elections would abrogate [its] discretion" regarding its handling of future bond elections. *See Todd v. Helton,* 495 S.W.2d 213, 220 (Tex.1973) (noting that elections are "essentially the exercise of political power," and exempt from judicial interference); *State ex rel. Edwards v. Reyna,* 160 Tex. 404, 333 S.W.2d 832, 833 (1960) ("[T]he conduct of elections is primarily a matter for legislative regulation and control.").

 Certain powers are conferred on government entities "for public purposes, and can neither be delegated nor bartered away." *Jasper,* 189 S.W.2d at 698. Government entities cannot "cede ... away [such powers] through contracts with others so as to disable them from the performance of their public duties." *Id.; see also Brenham v. Brenham Water Co.,* 67 Tex. 542, 4 S.W. 143, 149 (1887) ("[Municipal] corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass bylaws which shall cede away, control or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties.") (quotations omitted). However, it does not apply to the case at hand. Here, the Authority contracted not to bargain away future power, but to pay an invoice for services rendered if and when funds become available through voter-approved bonds.

Nor does the present situation suggest improper impediments to the Authority's governmental operations. In *Clear Lake City Water Authority v. Clear Lake Utilities,* we held that an agreement between the Authority and a utility company was not binding because it had "the effect of potentially controlling and embarrassing [the] Authority in the exercise of its governmental powers." *Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385, 392 (Tex.1977). In that case, the agreement obligated the Authority to meet all water and sewage treatment needs for the Utilities, while precluding it from extending those services directly to the landowners themselves, "under terms and rates that it deems best." *Id.* Thus we found that the Authority had bargained away its governmental power to determine "whether, on any particular date, it is in the best interests of all of its customers and the public in general, to extend water and sewer service to a particular person or entity." *Id.*

In this case, the Authority's contractual obligation to include a bond reimbursement proposition in future elections does not affect the performance of its public duties. It neither hampers nor embarrasses the manner in which the Authority holds elections—including the time, place, order, number of propositions, or even whether it chooses to hold a bond election at all. Nor does it control or impede the Authority's power to determine how and to whom it will extend water services. *See id.* We therefore reject the Authority's contention that the Agreements run afoul of the reserved powers doctrine.

## V. Inverse Condemnation Claim

 Finally, Kirby, Miter, and Taylor claim that the Authority's continued,

rent-free possession of the Facilities constitutes inverse condemnation. Under the Texas Constitution, no property may "be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." TEX. CONST. art. I, § 17(a). This provision, like the Fifth Amendment to the United States Constitution, applies not only to traditional takings claims, but also to inverse condemnation claims, in which a property owner alleges that the government has usurped the use and value of his or her property, even if it has not completely appropriated title. U.S. CONST. amend. V; *Stevens v. City of Cannon Beach*, 510 U.S. 1207, 114 S.Ct. 1332, 127 L.Ed.2d 679 (1994); *Town of Flower Mound v. Stafford Estates L.P.*, 135 S.W.3d 620, 646 (Tex.2004); *Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 130–31 (1962).

A person who consents to the governmental action, however, cannot validly assert a takings claim. *See City of Round Rock v. Smith*, 687 S.W.2d 300, 303 (Tex.1985) (holding that homeowners did not state a claim for inverse condemnation because their representative "consented to the taking"); *State v. Steck Co.*, 236 S.W.2d 866, 869 (Tex.Civ.App.-Austin 1951, writ ref'd); *Hightower v. City of Tyler*, 134 S.W.2d 404, 406 (Tex.Civ.App.-El Paso 1939, writ ref'd) (rejecting claim that city's use of water and sewer lines was a taking, because "appellants gave consent to the City to make such use of the lines as was made"). Moreover, when a private party contracts with the government, generally "the State does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute." *General Servs. Comm'n v. Little–Tex Insulation Co. Inc.*, 39 S.W.3d 591, 598–99

(Tex.2001). Instead, "the State is acting within a color of right under the contract and not under its eminent domain powers." *Id.* at 599 (noting that, in such cases, the State acts "akin to a private citizen and not under any sovereign powers"); *see also J.J. Henry Co. v. U.S.*, 188 Ct.Cl. 39, 411 F.2d 1246, 1249 (1969) ("The clear thrust of the authorities is that where the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment.").

We agree with the *Kirby Lake III* court, which observed that the Developers consented to any alleged taking when they "agreed to allow the Authority to lease and use the Facilities free of charge until the Authority purchases the Facilities." 2008 Tex.App. LEXIS 5887, at * 12–* 13 (concluding that the Developers' allegations affirmatively negated jurisdiction). As the court noted, the Developers "treated the Agreements as still in effect by continuing to demand performance ... and suing to enforce the Agreements"; [11] thus, the Authority was acting under colorable contract rights and did not have the requisite intent to take the Developers' facilities under any eminent domain powers. *See Little–Tex.*, 39 S.W.3d at 599. Accordingly, the Developers' inverse condemnation claim is barred.

## VI. Conclusion

In sum, we affirm the court of appeals' judgment in *Kirby Lake III*, which held the Developers did not state a claim for inverse condemnation. TEX.R.APP. P. 60.2(a). With respect to *Kirby Lake II* and *Friendswood II*, we reverse the court of appeals' judgments and remand to that

11. 2008 Tex.App. LEXIS 5887, at *14.

court to consider the Authority's remaining issues. *Id.* 60.2(d).

Justice GUZMAN did not participate in the decision.