OPINION

 

No. 04-10-00386-CV

 

WATER EXPLORATION
COMPANY, LTD,

Appellant

 

v.

 

BEXAR METROPOLITAN
WATER DISTRICT,

Appellee

 

From the 57th
Judicial District Court, Bexar County, Texas

Trial Court No. 2007-CI-18168

Honorable John D.
Gabriel, Jr., Judge Presiding

 

Opinion by:   Karen Angelini, Justice

 

Sitting:                     Karen Angelini, Justice

                     Phylis
J. Speedlin, Justice

                     Rebecca
Simmons, Justice

 

Delivered and
Filed:  February 2, 2011

 

AFFIRMED

 

           The issue in this interlocutory appeal is whether
section 271.152 of the Texas Local Government Code applies to the contract
between Water Exploration Co. and Bexar Metropolitan Water District. We
conclude that it does not and affirm the trial court’s order granting the plea
to the jurisdiction.

Background

           Appellant Water Exploration Co. (“WECO”)
finds, drills for, and produces commercial drinking water in Texas. Thus, WECO
leased groundwater rights from several landowners and on September 11, 2005,
with respect to these groundwater leases, entered into a long-term Water Supply
Agreement with Bexar Metropolitan Water District (“BexarMet”). In essence, WECO
sub-leased its rights under these groundwater leases to BexarMet. At issue in
this appeal is whether section 271.152 of the Local Government Code applies to
the Water Supply Agreement, thus waiving BexarMet’s immunity from suit. Believing
that section 271.152 does not apply to the Agreement, on March 20, 2010, the
trial court sustained BexarMet’s plea to the jurisdiction. WECO then filed this
interlocutory appeal.

Governmental Immunity

           In Texas, governmental immunity has two
components: immunity from liability, which bars enforcement of a judgment
against a governmental entity, and immunity from suit, which bars suit against
the entity altogether. Tooke v. City of Mexia, 197 S.W.3d 325, 332 (Tex.
2006). By entering into a contract, BexarMet waived “immunity from liability,
voluntarily binding itself like any other party to the terms of agreement.” Id.
But, it did not waive immunity from suit. See id. The Texas Supreme
Court has “consistently deferred to the Legislature to waive sovereign immunity
from suit, because this allows the Legislature to protect its policymaking
function.” Id. Specifically, the supreme court has deferred to the
Legislature to waive immunity from contract claims because (1) “the handling of
contract claims against the government involves policy choices more complex
than simply waiver of immunity, including whether to rely on administrative
processes and what remedies to allow”; (2) “the government should not be kept
from responding to changing conditions for the public welfare by prior policy
decisions reflected in long-term or ill-considered obligations”; (3) “the
claims process is tied to the appropriations process, and the priorities that
guide the latter should also inform the former;” and (4) “the Legislature is
able to deal not only with these policy concerns but also with individual
situations in deciding whether to waive immunity by resolution, case by case,
or by statute.” Id. (citations omitted). Thus, “in the contract-claims
context, legislative control over sovereign immunity allows the Legislature to
respond to changing conditions and revise existing agreements if doing so would
benefit the public.” Id. And, “to ensure that this legislative control
is not lightly disturbed, a waiver of immunity must be clear and unambiguous.” Id.
at 332-33.[1]

           Water Control and Improvement Districts are
“valid and existing governmental agencies and bodies politic.” Kirby Lake
Dev., Ltd. v. Clear Lake City Water Auth., 320 S.W.3d 829, 836 (Tex. 2010)
(citation omitted). Thus, they enjoy governmental immunity from suit, unless
immunity is expressly waived. Id.; Reata Constr. Corp. v. City of
Dallas, 197 S.W.3d 371, 374 (Tex. 2006). WECO does not dispute that
BexarMet is a governmental agency entitled to governmental immunity. Instead,
WECO argues that the language of section 271.152 of the Texas Local Government
Code, which expressly waives governmental immunity from suit for certain breach
of contract claims, encompasses the Water Supply Agreement between WECO and
BexarMet. 

           A.       Local Government
Code Section 271.152

           Section 271.152 provides that “[a] local
governmental entity that is authorized by statute or the constitution to enter
into a contract and that enters into a contract subject to this subchapter 

waives sovereign immunity to suit for the purpose of
adjudicating a claim for breach of the contract, subject to the terms and
conditions of this subchapter.” Tex.
Loc. Gov’t Code Ann. 
§ 271.152 (West 2005). A “[c]ontract subject to this subchapter” means “a
written contract stating the essential terms of the agreement for providing
goods or services to the local governmental entity that is properly
executed on behalf of the local governmental entity.” Id. 
§ 271.151(2) (emphasis added). Thus, the issue in this appeal is whether the
essential terms of the Water Supply Agreement provide services to BexarMet.[2]

           B.       Standard
of Review

           A plea to the jurisdiction is a dilatory
plea by which a party challenges a court’s authority to determine the subject
matter of the action. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547,
554 (Tex. 2000). The party suing the governmental entity bears the burden of
affirmatively showing that the trial court has jurisdiction to hear the cause. Tex.
Dep’t of Criminal Justice v. Miller, 51 S.W.3d 583, 587 (Tex. 2001);
see Tex. Natural Res. Conservation Comm’n v. It-Davy, 74 S.W.3d 849, 855
(Tex. 2002) (“A plaintiff who sues the State must establish the State’s consent
to suit.”). Whether a trial court has subject matter jurisdiction is a question
of law subject to de novo review. It-Davy, 74 S.W.3d at 855. Here, the parties do not dispute the language or
contents of the Agreement. Thus, we review de novo whether the Agreement is a
contract providing services to BexarMet.

           C.       The Water Supply Agreement
Between WECO and BexarMet

           BexarMet argues that the Water Supply
Agreement is not a contract where WECO provides services to BexarMet; instead,
BexarMet argues that the Water Supply Agreement provides for “the assignment of
leases of groundwater property rights, wells, pumps, and easements” and
obligates BexarMet to produce the groundwater and develop and operate the water
collection system. Further BexarMet argues that any “services” WECO would
provide to BexarMet are contingent and curative. In contrast, WECO argues that
pursuant to the Water Supply Agreement, it will provide “three major categories
of ‘services’” to BexarMet: (1) water quality services pursuant to Article II
2.02(c) and Article 7.01(b); (2) water amount curative services pursuant to
Article V 5.03(e) and Article VII 7.02(a)-(f); and (3) lease maintenance
requirements pursuant to Article III 3.03(b).

           The Water Supply Agreement explains that
WECO holds groundwater leases, that BexarMet “desires to produce the
groundwater associated with [those leases], and to transport the groundwater
produced to [BexarMet]’s existing public water system, so that it can be used
to supply water to [BexarMet]’s customers,” and that WECO “desires to lease its
right, title, and interest in [its groundwater leases] to [BexarMet], so that
[BexarMet] may accomplish its purpose, in accordance with the terms and
conditions of this Agreement.” 

           Under Article 4.01 of the Water Supply
Agreement, 

[BexarMet is] responsible for operating, maintaining,
repairing, and replacing the Facilities for that Tract, at its sole cost and
expense, as follows:

 

(a) [BexarMet] will maintain the Facilities in good working
order.

 

(b) [BexarMet] will promptly repair any Facilities that are
not in good working order and will take all steps reasonably necessary to
promptly remedy any interruptions in the production of water from the Wells and
the delivery of water to the Delivery Points.

 

(c) [BexarMet] will maintain and operate the Facilities in
accordance with all regulatory requirements and accepted utility operating
practices.

 

(d) [BexarMet] will provide property/casualty insurance for
the Facilities on the same or similar terms and conditions as it carries for
other comparable facilities.

Further, under Article 4.02, “[a]ll of the Facilities
constructed or operated by [BexarMet] pursuant to this Agreement, except the
Wells, shall be the property of [BexarMet].” “The Wells are the property of
[WECO], but are leased to [BexarMet] under Section 3.02 for the term of this
Agreement.”

           The Water Supply Agreement defines
“Facilities” as “(i) the Wells, (ii) the Wellhead Equipment, (iii) the Delivery
System, (iv) the Meters, and (v) any other facilities on the Leased Property.”
“Wellhead Equipment” is further defined as “all pumps, utilities, Meters, and
other facilities necessary to produce groundwater from a Well and to measure
the amount of water produced.” Thus, under the Water Supply Agreement, BexarMet
is solely responsible for maintaining, repairing, and operating the Wells.

           Nevertheless, WECO argues that it provides
services to BexarMet under Articles 2.02 and 7.01 of the Water Supply
Agreement, which WECO claims require it “to ensure the potable quality of the
water delivered to BexarMet.” In response, BexarMet argues that these
provisions of the Agreement are contingent and curative, and should not change
the nature of this contract as one for the lease of real property interests to
a contract providing services under section 271.152 of the Local Government
Code.

           Articles 2.02 and 7.01 of the Water Supply
Agreement provide the following:

Section 2.02. Initial Water Quality Testing.

 

(a)       No later than November 30, 2006, the
District [BexarMet] will, at its sole cost and expense: (i) conduct all tests
of each Well necessary to determine whether the water produced by each Well
meets the Minimum Water Quality Standards; and (ii) provide WECO with written
notice of the results of the testing of each Well.

 

(b)      WECO will have the right, but not the
obligation, to conduct tests of each Well, at its sole cost and expense, at the
same time the District conducts its test of each Well for the purpose of
determining whether the water produced by each Well meets the Minimum Water
Quality Standards; provided, however, that WECO’s testing may not unreasonably
interfere with the testing being conducted by the District.

 

(c)       If the water produced by a Well fails to
meet the Minimum Water Quality Standards, and WECO fails, at its sole expense,
to cure that failure within 330 days of the Effective Date, then the
District may, at its election, terminate this Agreement with respect to that
Well by providing WECO with notice of that election within 360 days following
the Effective Date. Such termination is the District’s sole and exclusive
remedy for the failure of the water produced by that Well to meet the Minimum
Water Quality Standards. If the District terminates this Agreement with respect
to all Wells on a Tract for failure to meet Minimum Water Quality Standards,
then the Agreement shall be considered terminated with respect to that Tract.

 

***

Section 7.01. Water Quality Testing

 

(a)       Following the Well Delivery Date, the
District may, at its sole expense, conduct any tests necessary to determine
whether the water produced by a Well meets the Minimum Water Quality Standards
at any time; provided that, unless both Parties agree, there will be no such
testing during Water Conservation Months. The District will provide WECO with
written notice of the results of such testing within thirty (30) days of
receipt of the results.

 

(b)      If the water produced by a Well fails to
meet the Minimum Water Quality Standards, and WECO fails, at its sole expense,
to cure that failure within 150 days following receipt of the written notice of
the results of the testing of that Well, then the District may, at its election,
terminate this Agreement with respect to that Well by providing WECO with
notice of that election within 180 days following WECO’s receipt of the written
notice of the results of the testing of each Well. Such termination is the
District’s sole and exclusive remedy for the failure of the water produced by
that Well to meet the Minimum Water Quality Standards. If the District
terminates this Agreement with respect to all Wells on a Tract for failure to
meet Minimum Water Quality Standards, then the Agreement shall be considered
terminated with respect to that Tract.

 

(emphasis added). Thus, under the Water Supply
Agreement, BexarMet may, at its own expense, conduct any tests necessary to
determine whether the water produced by a Well meets the Minimum Water Quality
Standards. If BexarMet’s tests show that the water does not meet such minimum
standards, then WECO can either cure such failure at its own expense or allow
BexarMet to terminate the Agreement with respect to that well.

           Similarly, WECO argues that Articles 5.03 and
7.02 require it “to maintain a minimum amount of commercial water production
for each tract covered by” the Water Supply Agreement by, “for example,
refracturing wells or lowing pumps deeper into wellbore to increase production.”
BexarMet again emphasizes that these provisions are contingent and curative.
Articles 5.03 and 7.02 state the following:

Section 5.03. Minimum Payment.

 

(a)       Without regard to the amount of water
produced from the Wells on a Tract, the District’s payments to WECO for a Tract
for each calendar month will never be less than the Monthly Minimum Payment for
that Tract provided sufficient water is available to meet one-twelfth (1/12) of
the percentage of “Maximum Sustainable Yield” (for a given production year) set-forth
in Section 5.03(b). In the event that any Tract is unable, in any month, to
produce water in a quantity sufficient to meet the applicable (percentage)
multiplier for “Maximum Sustainable Yield” (i.e. 0.25 for 1st and 2nd
production years, etc.), then the District’s minimum payment for that month
shall be calculated solely on the amount of water actually produced from the
Tract at the rate set-forth in Section 5.02(a) of this Agreement. . . .

 

(e)       In the event that any given Tract fails
to meet the Minimum Average Well Production of a Tract after 330 days following
the Effective Date, WECO will be given sixty (60) days to cure the Tract
failure by using all reasonable measures to redevelop the effected Well(s)
to include, but not limited to, lowering the pump and fracturing the Well(s).
The District at its sole expense will bear the cost of lowering the pump and/or
increasing the pump size if determined necessary by the District and WECO will
at its sole expense will [sic] pay for the fracturing of the Well. WECO agrees
that it will assume liability for any and all claims, demands, damages, losses,
and expenses arising out of lowering the pump(s) beneath the Well casing.

 

Section 7.02. Water Production
Testing.

 

(a)       Subject to the limitations
provided in subsections 2.04, 7.02(e) and 7.02(f), WECO may, at any time during
the first seven (7) years following the Well Delivery Date for a Tract, request
that the Wells on a Tract be retested, and that the Minimum Water Production
for a Well, Minimum Average Well Production for a Tract, and Maximum
Sustainable Yield of that Tract be redetermined, by giving written notice to
the District of its request (the “Retesting Request”).

 

(b)      The Wells will be tested and the Minimum
Water Production for a Well, Minimum Average Well Production for a Tract, and
the Maximum Sustainable Yield of a Tract will be determined using the
procedures set out in Section 2.01(a), (b), and (c), except that: (i) the
retesting of the Wells and the redetermination of the Minimum Water Production
for a Well, Minimum Average Well Production for a Tract, and Maximum
Sustainable Yield of the Tract will take place within 180 days following the
date of the Retesting Request, subject to the limitations provided in
subsection 7.02(e) and 7.02(f); (ii) WECO will pay all costs associated with
the tests described in Section 2.01(a); (iii) the portion of Section 2.01(a)
requiring acidization of the Wells will not apply; and (iv) in the event WECO
disagrees with the results of the District’s retests of a Well or the
District’s re-determination of the Maximum Sustainable Yield for a Tract, the
WECO expert, the District Expert, and the Third Party Expert will each conduct
any tests that each respective Expert considers necessary to determine the
Maximum Sustainable Yield of the Tract, and will determine the Maximum
Sustainable Yield of the Tract, within 300 days following the date of the Retesting
request.

 

(c)       If the testing of an Unproductive Well
demonstrates that the Well remains incapable of producing at least 0.50
acre-feet per day, and WECO, fails at its sole expense, to cure that failure within
330 days following the date of the Retesting Request, then the District may, at
its election, terminate this Agreement with respect to that Unproductive Well by
providing WECO with written notice of that election within 360 days following
the date of the Retesting Request. Such termination, and the reimbursement
described in Section 2.01(a) are the District’s sole and exclusive remedy for
the failure of that Unproductive Well to meet or exceed the Minimum Water
Production for a Well.

 

(d)      If, after retesting, the Maximum
Sustainable Yield of a Tract fails to equal or exceed the Minimum Average Well
Production for a Tract, and WECO fails, at its sole expense, to cure that
failure within 330 days following the date of the Retesting Request, then
the District may, at its election, terminate this Agreement with respect to
that Tract by providing WECO with written notice of that election within 360
days following the date of the Retesting Request. Such termination is the
District’s sole and exclusive remedy for the failure of that Tract’s Maximum
Sustainable Yield to meet or exceed the Minimum Average Well Production for a
Tract.

 

(e)       The retesting of Wells for the purpose of
redetermination of the Maximum Sustainable Yield of a Tract [that] results from
a Retesting Request made in accordance with Section 7.02(a) shall not occur
within ninety (90) days of the last calendar day of any month in which the
total rainfall exceeds by more than twenty-five percent (25%), the 30-year
normal/average rainfall for San Antonio, Texas for such month, as recorded by
the National Weather Service Forecast Office (30 year normals 1971-2000). . . .
If after the District receives a Retesting Request (but before the expiration
of 180 days), the monthly rainfall for any month exceeds the 30-year
normal/average rainfall for San Antonio, Texas for such month by more than
twenty-five percent (25%), the retesting prescribed by Subsection 7.02(b)(i)
will take place within 90 days after the last calendar day such month. 

 

(f)       In no event will any Well on a Tract be
retested or the Minimum Water Production for a Well, the Minimum Average Well
Production for a Tract, or the Maximum Sustainable Yield of any Tract be
redetermined more than once during the seven year period provided in this
Section.

 

(emphasis added). Thus, the issue here is whether
these type of option-to-cure provisions in a contract for the lease of real
estate interests amount to a contract that provides services to the local
governmental entity, thereby waiving immunity pursuant to section 271.152.

           Recently, the Texas Supreme Court in Kirby
Lake Development, Ltd. v. Clear Lake City Water Authority, 320 S.W.3d 829,
832 (Tex. 2010), considered whether section 271.152 waived sovereign immunity
with respect to a contract between residential developers and a local water
authority. The contract stipulated that the developers would build water and
sewer facilities according to the water authority’s specifications, and that
the developers would lease the facilities to the water authority free of charge
until the water authority purchased them. Id. The water authority agreed
to reimburse the developers 70% of their construction costs once it received
voter-approved bond funds. Id. at 832-33. That is, the contract provided
that until a bond sale was approved in an election, the water authority was not
obligated to reimburse the developers. Id. at 833. The contract then
provided for the following with respect to when a bond election would be
called:

Subject to other terms and provisions hereof, the
Developer agrees to sell and the Authority agrees to purchase all completed
portions of the Facilities ... as soon as possible, but not more than 30 days
after receipt of bond proceeds legally available and allocated by the Authority
for payment therefore....

 

It is expressly acknowledged and agreed by the parties
hereto, that the Authority has no existing voter authorization to issue any
bonds to pay for the cost of the Facilities, and does not anticipate that funds
will be available for such costs without a voter approved bond sale for such purchase.
The Authority intends to call a bond election in the near future but is not
obligated to do so, and the Authority cannot predict when, if ever, such an
election and bond sale will occur, or when, if ever, the Authority will have
other funds available and allocated for the purchase of the Facilities. The
Authority shall have the right to purchase the Facilities with funds available
from a source other than a bond sale for such purpose, but shall have no
obligation to do so. The Authority does agree, however, that it shall include
in any bond election it does hold subsequent to the effective date of this
Agreement bond authorization in an amount sufficient to pay the purchase price
of the Facilities.

 

Id.
(emphasis in original).

           The developers sued, arguing that the water
authority breached this agreement by failing to include a reimbursement
provision in each bond election. Id. at 834. In response, the water
authority argued that it was immune from suit. Id. The supreme court,
however, held that immunity had been waived pursuant to section 271.152. Id.
at 836. The court first noted that the “Legislature enacted section 271.152 ‘to
loosen the immunity bar so that all local governmental entities that
have been given or are given the statutory authority to enter into contracts
shall not be immune from suits arising from those contracts.’” Id. at 838
(quoting Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political
Subdivisions Prop./Cas. Joint Self-Ins. Fund, 212 S.W.3d 320, 327 (Tex.
2006)) (emphasis in original). The court then turned to the language of section
271.152 and considered whether the contract at issue was one where the
essential terms of the agreement provided goods or services to the local governmental
entity. Id. at 839. 

           The supreme court noted that chapter 271
“provides no definition for ‘services,’ despite the Legislature’s definition of
the term in other contexts.” Id. It nevertheless concluded that “[i]t appears,
generally, that the term is broad enough to encompass a wide array of
activities.” Id. The supreme court cited its holding in Ben Bolt
as an example:

In Ben Bolt, we liberally construed a
government-pooled insurance policy (the “Fund”) as encompassing “services”
rendered by its members, based on the fact that the Fund’s “members elect a
governing board, and a board subcommittee resolves claims disputes. To that
extent, at least, the Fund’s members provide services to the Fund.”

 

Id. The
supreme court thus reasoned that the services provided “need not be the primary
purpose of the agreement.” Id. In looking at the contract at issue, the
supreme court concluded that immunity had been waived pursuant to section
271.152:

We agree with the court of appeals that the Agreements
entail services provided directly to the Authority. The Developers contracted
to construct, develop, lease, and bear all risk of loss or damage to the
facilities, obligations far more concrete than those at issue in Ben Bolt,
212 S.W.3d at 327. We therefore hold that the Agreements contemplate the
provision of services under the statute.

 

Id. (emphasis
added).

           In citing Kirby Lake for support,
WECO emphasizes the supreme court’s statement that services need not be the
primary purpose of the agreement. Thus, according to WECO, even the
option-to-cure provisions in the Agreement, which allow WECO to cure defects or
allow the Agreement to terminate, constitute “services” under Kirby Lake.
However, WECO’s interpretation of Kirby Lake has the danger of
converting every real estate contract into a contract for services – something
we do not believe the Legislature intended. In enacting section 271.152, the
Legislature specifically stated that it was waiving governmental immunity only
for contracts where goods or services are provided to the local governmental
entity. See Tex. Loc.
Gov’t Code Ann. § 271.152 (West 2005); see also Bexar Metro. Water Dist. v. Educ. & Economic Dev.
Joint Venture, 220 S.W.2d 25, 31-32
(Tex. App.—San Antonio 2006, pet. dism’d) (explaining contracts for the sale or
lease of real estate are not included within section 271.152’s waiver of
immunity). Had the Legislature intended
to waive immunity for all contracts entered into by the State, it would have so
stated. E. Houston Estate Apartments, LLC v. City of Houston, 294 S.W.3d
723, 736 (Tex. App.—Houston [1st Dist.] 2009, no pet.); see also Tex. Gov’t Code Ann. § 311.034 (West
Supp. 2010) (“In order to preserve the Legislature’s interest in managing state
fiscal matters through the appropriations process, a statute shall not be
construed as a waiver of sovereign immunity unless the waiver is effected by
clear and unambiguous language.”). Thus, we believe “services” under section
271.152 cannot mean any service – no matter how curative or remote because such
an interpretation has the danger of encompassing all contracts.

           Under the Agreement, BexarMet has clearly
leased a real estate interest from WECO – the right to withdraw groundwater
beneath the tracts through wells that already exist, that already have access
to groundwater, and that already have received all necessary permits. BexarMet
has also leased the wells themselves, well permits, easements, and all other
property interests related to the wells. Further, under the Agreement,
BexarMet, at its sole cost and expense, is solely responsible for operating,
maintaining, repairing, and replacing the Facilities. And, but for the wells it
has leased from WECO, it is responsible for constructing all other Facilities.
Only if the wells are not capable of producing groundwater in the quantity and
quality that was agreed upon by WECO and BexarMet do the option-to-cure
provisions come into play. That is, if the property being leased is not usable,
or becomes unusable, WECO has the option to either cure the defect or allow
BexarMet to terminate the Agreement. Under the facts of this case, we hold that
the Agreement’s option-to-cure provisions are not sufficient to trigger a
waiver of governmental immunity under section 271.152. See Somerset Indep.
Sch. Dist. v. Casias, No. 04-07-00829-CV, 2008 WL 1805533, at *3 (Tex.
App.—San Antonio 2008, pet. denied) (holding that section 271.152 did not waive
immunity with respect to the contract because the earnest money contract itself
was for the sale of land; the services at issue were a condition to closing); City
of San Antonio v. Reed S. Lehman Grain, Ltd., No. 04-04-00930-CV, 2007 WL
752197, at *2 n.2 (Tex. App.—San Antonio 2007, pet. denied) (noting section
271.152 not applicable to claim for breach of easement dedication contract
because it conveyed an interest in real property and was not an agreement for
providing goods and services).

           Finally, WECO argues that it provides
services to BexarMet under Articles 3.03 and 3.08, which provide the following:

Section 3.03. Lease Agreements.

 

(a) WECO represents to the District that:
(a) WECO has delivered to the District a full and complete copy of each Lease
Agreement; (b) to WECO’s current actual knowledge and belief, the Lease
Agreements are, as of Effective Date, in full force and effect; and (c) to
WECO’s current actual knowledge and belief, no event of default has occurred
and is continuing [that] would constitute an event of default but for the
requirement of the giving of notice and/or the expiration of the period of time
to cure.

 

(b) WECO will keep the Lease Agreements in full force
and effect during the term of this Agreement and will not modify the Lease
Agreements without the written consent of the District, which consent will not
be unreasonably withheld or delayed.

 

(c) In the event of any act or omission by WECO that
causes a default under the terms of a Lease Agreement that would give Lessor
the right, either immediately or after the lapse of time, to terminate the
Lease in whole or in part, the District will have the right, but not the
obligation, to cure such default. Any sums the district pays to a Lessor under
this Section shall be credited against the amounts next due to WECO by the
District under the terms of this Agreement.

 

Section 3.08. Permits.

 

(a) Within 90 days following the Facilities Delivery
Date for a Tract, [WECO] will obtain all Permits for that Tract and deliver
copies of the Permits for that Tract to [BexarMet]. [BexarMet] shall cooperate
in the conducting of tests or other operations involving the Wells or the
Facilities that are necessary to obtain a Permit for a Well.

 

(b) [WECO] represents to [BexarMet] that, to the best
of its knowledge, each Well meets the following requirements (the “Exemption
Requirements”): (i) the Well was in existence on September 1, 2001; or (ii) the
TCEQ has approved plans submitted for the installation of the Well before
September 1, 2001, and the installation of the Well was completed in accordance
with the approved plans and the TCEQ’s technical requirements before September
1, 2002. If it is determined that a Well does not meet either of the two
Exemption Requirements, then [WECO] shall be responsible for the payment of any
additional production fees or substitute groundwater production taxes imposed
by a Groundwater District as a result of such Well’s failure to meet the
Exemption Requirements. The amount of the additional fees or taxes shall be
credited against any amounts due to [WECO] for the Tract on which such Well is
located under Article V.

 

WECO argues that these sections require it to maintain
and abide by the terms of its leases during the term of the Agreement,
including “paying royalties to WECO’s lessors and performing other services.” According
to WECO, “[b]ut for WECO’s lease-maintaining services, BexarMet would lose this
supply of water for its customers.” However, when one is subleasing any real
estate interest to a third party, one would necessarily be required to maintain
one’s own primary lease. And, when one is leasing wells like the wells at
issue, one would necessarily have to show that one has permits for such wells.
Thus, like the option-to-cure provisions in the Agreement, holding that such
provisions constitute “services” under section 271.152 would have the danger of
converting every contract subleasing a real estate interest into a contract for
services. 

           We hold that because the Agreement does not
constitute a “contract stating the essential terms of the agreement for
providing  . . . services to the local governmental entity,” Tex. Loc. Gov’t Code Ann. § 271.151(2)
(West 2005), governmental immunity has not been waived pursuant to section
271.152, see id. § 271.152. And, because there has been no waiver of
governmental immunity pursuant to section 271.152, we affirm the trial court’s
order granting BexarMet’s plea to the jurisdiction.[3]


 

 

Karen Angelini, Justice

 

 

 

 









[1]
In Texas Natural Resources Conservation Commission v. It-Davy, 74 S.W.3d
849, 857-58 (Tex. 2002), the supreme court held that there was no waiver of
immunity from suit even though the governmental agency had expressly waived
immunity in the contract. According to the court, “[o]nly the Legislature can
waive sovereign immunity from suit in a breach-of-contract claim.” Id.
at 858. In the Water Supply Agreement, BexarMet expressly waived sovereign
immunity. In its plea to the jurisdiction, BexarMet argued that this language in
the contract was immaterial because it did not have the legal authority to
waive sovereign immunity – only the Legislature could. WECO has not argued on
appeal that the express language in the contract constituted a waiver of
sovereign immunity.





[2]
Although in oral argument WECO in a conclusory fashion stated that it believed
the Water Supply Agreement also provided “goods,” WECO has not adequately briefed
this issue. See Tex. R. App. P.
38.1(i). Thus, to the extent WECO claims that the Agreement provided “goods” to
BexarMet, it has waived the issue. 





[3]
Having determined that governmental immunity was not waived under section
271.152, we need not reach BexarMet’s cross point.