Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio





# OPINION

No. 04-10-00386-CV

**WATER EXPLORATION COMPANY, LTD**,
Appellant

v.

**BEXAR METROPOLITAN WATER DISTRICT**,
Appellee

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CI-18168
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:   Karen Angelini, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  February 2, 2011

AFFIRMED

The issue in this interlocutory appeal is whether section 271.152 of the Texas Local Government Code applies to the contract between Water Exploration Co. and Bexar Metropolitan Water District. We conclude that it does not and affirm the trial court's order granting the plea to the jurisdiction.

**BACKGROUND**

Appellant Water Exploration Co. ("WECO") finds, drills for, and produces commercial drinking water in Texas. Thus, WECO leased groundwater rights from several landowners and on September 11, 2005, with respect to these groundwater leases, entered into a long-term Water Supply Agreement with Bexar Metropolitan Water District ("BexarMet"). In essence, WECO sub-leased its rights under these groundwater leases to BexarMet. At issue in this appeal is whether section 271.152 of the Local Government Code applies to the Water Supply Agreement, thus waiving BexarMet's immunity from suit. Believing that section 271.152 does not apply to the Agreement, on March 20, 2010, the trial court sustained BexarMet's plea to the jurisdiction. WECO then filed this interlocutory appeal.

**GOVERNMENTAL IMMUNITY**

In Texas, governmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). By entering into a contract, BexarMet waived "immunity from liability, voluntarily binding itself like any other party to the terms of agreement." *Id.* But, it did not waive immunity from suit. *See id.* The Texas Supreme Court has "consistently deferred to the Legislature to waive sovereign immunity from suit, because this allows the Legislature to protect its policymaking function." *Id.* Specifically, the supreme court has deferred to the Legislature to waive immunity from contract claims because (1) "the handling of contract claims against the government involves policy choices more complex than simply waiver of immunity, including whether to rely on administrative processes and what remedies to allow"; (2) "the government should not be kept from responding to changing conditions for the public welfare by prior policy decisions reflected

in long-term or ill-considered obligations"; (3) "the claims process is tied to the appropriations process, and the priorities that guide the latter should also inform the former;" and (4) "the Legislature is able to deal not only with these policy concerns but also with individual situations in deciding whether to waive immunity by resolution, case by case, or by statute." *Id.* (citations omitted). Thus, "in the contract-claims context, legislative control over sovereign immunity allows the Legislature to respond to changing conditions and revise existing agreements if doing so would benefit the public." *Id.* And, "to ensure that this legislative control is not lightly disturbed, a waiver of immunity must be clear and unambiguous." *Id.* at 332-33.[1]

Water Control and Improvement Districts are "valid and existing governmental agencies and bodies politic." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 836 (Tex. 2010) (citation omitted). Thus, they enjoy governmental immunity from suit, unless immunity is expressly waived. *Id.*; *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). WECO does not dispute that BexarMet is a governmental agency entitled to governmental immunity. Instead, WECO argues that the language of section 271.152 of the Texas Local Government Code, which expressly waives governmental immunity from suit for certain breach of contract claims, encompasses the Water Supply Agreement between WECO and BexarMet.

### A.     *Local Government Code Section 271.152*

Section 271.152 provides that "[a] local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter

---

[1] In *Texas Natural Resources Conservation Commission v. It-Davy*, 74 S.W.3d 849, 857-58 (Tex. 2002), the supreme court held that there was no waiver of immunity from suit even though the governmental agency had expressly waived immunity in the contract. According to the court, "[o]nly the Legislature can waive sovereign immunity from suit in a breach-of-contract claim." *Id.* at 858. In the Water Supply Agreement, BexarMet expressly waived sovereign immunity. In its plea to the jurisdiction, BexarMet argued that this language in the contract was immaterial because it did not have the legal authority to waive sovereign immunity – only the Legislature could. WECO has not argued on appeal that the express language in the contract constituted a waiver of sovereign immunity.

waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter." TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2005). A "[c]ontract subject to this subchapter" means "a written contract stating *the essential terms of the agreement for providing goods or services to the local governmental entity* that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2) (emphasis added). Thus, the issue in this appeal is whether the essential terms of the Water Supply Agreement provide services to BexarMet.[2]

### B.      Standard of Review

A plea to the jurisdiction is a dilatory plea by which a party challenges a court's authority to determine the subject matter of the action. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The party suing the governmental entity bears the burden of affirmatively showing that the trial court has jurisdiction to hear the cause. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001); *see Tex. Natural Res. Conservation Comm'n v. It-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) ("A plaintiff who sues the State must establish the State's consent to suit."). Whether a trial court has subject matter jurisdiction is a question of law subject to de novo review. *It-Davy*, 74 S.W.3d at 855. Here, the parties do not dispute the language or contents of the Agreement. Thus, we review de novo whether the Agreement is a contract providing services to BexarMet.

### C.      The Water Supply Agreement Between WECO and BexarMet

BexarMet argues that the Water Supply Agreement is not a contract where WECO provides services to BexarMet; instead, BexarMet argues that the Water Supply Agreement provides for "the assignment of leases of groundwater property rights, wells, pumps, and

---

[2] Although in oral argument WECO in a conclusory fashion stated that it believed the Water Supply Agreement also provided "goods," WECO has not adequately briefed this issue. *See* TEX. R. APP. P. 38.1(i). Thus, to the extent WECO claims that the Agreement provided "goods" to BexarMet, it has waived the issue.

easements" and obligates BexarMet to produce the groundwater and develop and operate the water collection system. Further BexarMet argues that any "services" WECO would provide to BexarMet are contingent and curative. In contrast, WECO argues that pursuant to the Water Supply Agreement, it will provide "three major categories of 'services'" to BexarMet: (1) water quality services pursuant to Article II 2.02(c) and Article 7.01(b); (2) water amount curative services pursuant to Article V 5.03(e) and Article VII 7.02(a)-(f); and (3) lease maintenance requirements pursuant to Article III 3.03(b).

The Water Supply Agreement explains that WECO holds groundwater leases, that BexarMet "desires to produce the groundwater associated with [those leases], and to transport the groundwater produced to [BexarMet]'s existing public water system, so that it can be used to supply water to [BexarMet]'s customers," and that WECO "desires to lease its right, title, and interest in [its groundwater leases] to [BexarMet], so that [BexarMet] may accomplish its purpose, in accordance with the terms and conditions of this Agreement."

Under Article 4.01 of the Water Supply Agreement,

> [BexarMet is] responsible for operating, maintaining, repairing, and replacing the Facilities for that Tract, at its sole cost and expense, as follows:
>
> (a) [BexarMet] will maintain the Facilities in good working order.
>
> (b) [BexarMet] will promptly repair any Facilities that are not in good working order and will take all steps reasonably necessary to promptly remedy any interruptions in the production of water from the Wells and the delivery of water to the Delivery Points.
>
> (c) [BexarMet] will maintain and operate the Facilities in accordance with all regulatory requirements and accepted utility operating practices.
>
> (d) [BexarMet] will provide property/casualty insurance for the Facilities on the same or similar terms and conditions as it carries for other comparable facilities.

Further, under Article 4.02, "[a]ll of the Facilities constructed or operated by [BexarMet] pursuant to this Agreement, except the Wells, shall be the property of [BexarMet]." "The Wells are the property of [WECO], but are leased to [BexarMet] under Section 3.02 for the term of this Agreement."

The Water Supply Agreement defines "Facilities" as "(i) the Wells, (ii) the Wellhead Equipment, (iii) the Delivery System, (iv) the Meters, and (v) any other facilities on the Leased Property." "Wellhead Equipment" is further defined as "all pumps, utilities, Meters, and other facilities necessary to produce groundwater from a Well and to measure the amount of water produced." Thus, under the Water Supply Agreement, BexarMet is solely responsible for maintaining, repairing, and operating the Wells.

Nevertheless, WECO argues that it provides services to BexarMet under Articles 2.02 and 7.01 of the Water Supply Agreement, which WECO claims require it "to ensure the potable quality of the water delivered to BexarMet." In response, BexarMet argues that these provisions of the Agreement are contingent and curative, and should not change the nature of this contract as one for the lease of real property interests to a contract providing services under section 271.152 of the Local Government Code.

Articles 2.02 and 7.01 of the Water Supply Agreement provide the following:

**Section 2.02. Initial Water Quality Testing.**

(a)     No later than November 30, 2006, the District [BexarMet] will, at its sole cost and expense: (i) conduct all tests of each Well necessary to determine whether the water produced by each Well meets the Minimum Water Quality Standards; and (ii) provide WECO with written notice of the results of the testing of each Well.

(b)     WECO will have the right, but not the obligation, to conduct tests of each Well, at its sole cost and expense, at the same time the District conducts its test of each Well for the purpose of determining whether the water produced by each Well meets the Minimum Water Quality Standards; provided, however, that

WECO's testing may not unreasonably interfere with the testing being conducted by the District.

(c)     *If the water produced by a Well fails to meet the Minimum Water Quality Standards, and WECO fails, at its sole expense, to cure that failure within 330 days of the Effective Date*, then the District may, at its election, terminate this Agreement with respect to that Well by providing WECO with notice of that election within 360 days following the Effective Date. Such termination is the District's sole and exclusive remedy for the failure of the water produced by that Well to meet the Minimum Water Quality Standards. If the District terminates this Agreement with respect to all Wells on a Tract for failure to meet Minimum Water Quality Standards, then the Agreement shall be considered terminated with respect to that Tract.

***

**Section 7.01. Water Quality Testing**

(a)     Following the Well Delivery Date, the District may, at its sole expense, conduct any tests necessary to determine whether the water produced by a Well meets the Minimum Water Quality Standards at any time; provided that, unless both Parties agree, there will be no such testing during Water Conservation Months. The District will provide WECO with written notice of the results of such testing within thirty (30) days of receipt of the results.

(b)     *If the water produced by a Well fails to meet the Minimum Water Quality Standards, and WECO fails, at its sole expense, to cure that failure within 150 days following receipt of the written notice of the results of the testing of that Well,* then the District may, at its election, terminate this Agreement with respect to that Well by providing WECO with notice of that election within 180 days following WECO's receipt of the written notice of the results of the testing of each Well. Such termination is the District's sole and exclusive remedy for the failure of the water produced by that Well to meet the Minimum Water Quality Standards. If the District terminates this Agreement with respect to all Wells on a Tract for failure to meet Minimum Water Quality Standards, then the Agreement shall be considered terminated with respect to that Tract.

(emphasis added). Thus, under the Water Supply Agreement, BexarMet may, at its own expense, conduct any tests necessary to determine whether the water produced by a Well meets the Minimum Water Quality Standards. If BexarMet's tests show that the water does not meet such minimum standards, then WECO can either cure such failure at its own expense or allow BexarMet to terminate the Agreement with respect to that well.

Similarly, WECO argues that Articles 5.03 and 7.02 require it "to maintain a minimum amount of commercial water production for each tract covered by" the Water Supply Agreement by, "for example, refracturing wells or lowing pumps deeper into wellbore to increase production." BexarMet again emphasizes that these provisions are contingent and curative. Articles 5.03 and 7.02 state the following:

**Section 5.03. Minimum Payment.**

(a)     Without regard to the amount of water produced from the Wells on a Tract, the District's payments to WECO for a Tract for each calendar month will never be less than the Monthly Minimum Payment for that Tract provided sufficient water is available to meet one-twelfth (1/12) of the percentage of "Maximum Sustainable Yield" (for a given production year) set-forth in Section 5.03(b). In the event that any Tract is unable, in any month, to produce water in a quantity sufficient to meet the applicable (percentage) multiplier for "Maximum Sustainable Yield" (i.e. 0.25 for 1st and 2nd production years, etc.), then the District's minimum payment for that month shall be calculated solely on the amount of water actually produced from the Tract at the rate set-forth in Section 5.02(a) of this Agreement. . . .

(e)     *In the event that any given Tract fails to meet the Minimum Average Well Production of a Tract after 330 days following the Effective Date, WECO will be given sixty (60) days to cure the Tract failure* by using all reasonable measures to redevelop the effected Well(s) to include, but not limited to, lowering the pump and fracturing the Well(s). The District at its sole expense will bear the cost of lowering the pump and/or increasing the pump size if determined necessary by the District and WECO will at its sole expense will [sic] pay for the fracturing of the Well. WECO agrees that it will assume liability for any and all claims, demands, damages, losses, and expenses arising out of lowering the pump(s) beneath the Well casing.

**Section 7.02. Water Production Testing.**

(a)     Subject to the limitations provided in subsections 2.04, 7.02(e) and 7.02(f), WECO may, at any time during the first seven (7) years following the Well Delivery Date for a Tract, request that the Wells on a Tract be retested, and that the Minimum Water Production for a Well, Minimum Average Well Production for a Tract, and Maximum Sustainable Yield of that Tract be redetermined, by giving written notice to the District of its request (the "Retesting Request").

(b)     The Wells will be tested and the Minimum Water Production for a Well, Minimum Average Well Production for a Tract, and the Maximum Sustainable Yield of a Tract will be determined using the procedures set out in Section 2.01(a), (b), and (c), except that: (i) the retesting of the Wells and the redetermination of the Minimum Water Production for a Well, Minimum Average Well Production for a Tract, and Maximum Sustainable Yield of the Tract will take place within 180 days following the date of the Retesting Request, subject to the limitations provided in subsection 7.02(e) and 7.02(f); (ii) WECO will pay all costs associated with the tests described in Section 2.01(a); (iii) the portion of Section 2.01(a) requiring acidization of the Wells will not apply; and (iv) in the event WECO disagrees with the results of the District's retests of a Well or the District's re-determination of the Maximum Sustainable Yield for a Tract, the WECO expert, the District Expert, and the Third Party Expert will each conduct any tests that each respective Expert considers necessary to determine the Maximum Sustainable Yield of the Tract, and will determine the Maximum Sustainable Yield of the Tract, within 300 days following the date of the Retesting request.

(c)     *If the testing of an Unproductive Well demonstrates that the Well remains incapable of producing at least 0.50 acre-feet per day, and WECO, fails at its sole expense, to cure that failure* within 330 days following the date of the Retesting Request, then the District may, at its election, terminate this Agreement with respect to that Unproductive Well by providing WECO with written notice of that election within 360 days following the date of the Retesting Request. Such termination, and the reimbursement described in Section 2.01(a) are the District's sole and exclusive remedy for the failure of that Unproductive Well to meet or exceed the Minimum Water Production for a Well.

(d)     *If, after retesting, the Maximum Sustainable Yield of a Tract fails to equal or exceed the Minimum Average Well Production for a Tract, and WECO fails, at its sole expense, to cure that failure* within 330 days following the date of the Retesting Request, then the District may, at its election, terminate this Agreement with respect to that Tract by providing WECO with written notice of that election within 360 days following the date of the Retesting Request. Such termination is the District's sole and exclusive remedy for the failure of that Tract's Maximum Sustainable Yield to meet or exceed the Minimum Average Well Production for a Tract.

(e)     The retesting of Wells for the purpose of redetermination of the Maximum Sustainable Yield of a Tract [that] results from a Retesting Request made in accordance with Section 7.02(a) shall not occur within ninety (90) days of the last calendar day of any month in which the total rainfall exceeds by more than twenty-five percent (25%), the 30-year normal/average rainfall for San Antonio, Texas for such month, as recorded by the National Weather Service Forecast Office (30 year normals 1971-2000). . . . If after the District receives a Retesting Request (but before the expiration of 180 days), the monthly rainfall for any

month exceeds the 30-year normal/average rainfall for San Antonio, Texas for such month by more than twenty-five percent (25%), the retesting prescribed by Subsection 7.02(b)(i) will take place within 90 days after the last calendar day such month.

(f)    In no event will any Well on a Tract be retested or the Minimum Water Production for a Well, the Minimum Average Well Production for a Tract, or the Maximum Sustainable Yield of any Tract be redetermined more than once during the seven year period provided in this Section.

(emphasis added). Thus, the issue here is whether these type of option-to-cure provisions in a contract for the lease of real estate interests amount to a contract that provides services to the local governmental entity, thereby waiving immunity pursuant to section 271.152.

Recently, the Texas Supreme Court in *Kirby Lake Development, Ltd. v. Clear Lake City Water Authority*, 320 S.W.3d 829, 832 (Tex. 2010), considered whether section 271.152 waived sovereign immunity with respect to a contract between residential developers and a local water authority. The contract stipulated that the developers would build water and sewer facilities according to the water authority's specifications, and that the developers would lease the facilities to the water authority free of charge until the water authority purchased them. *Id.* The water authority agreed to reimburse the developers 70% of their construction costs once it received voter-approved bond funds. *Id.* at 832-33. That is, the contract provided that until a bond sale was approved in an election, the water authority was not obligated to reimburse the developers. *Id.* at 833. The contract then provided for the following with respect to when a bond election would be called:

Subject to other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds legally available and allocated by the Authority for payment therefore....

*It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs*

- 10 -

> *without a voter approved bond sale for such purchase. The Authority intends to call a bond election in the near future but is not obligated to do so, and the Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities. The Authority shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so. The Authority does agree, however, that it shall include in any bond election it does hold subsequent to the effective date of this Agreement bond authorization in an amount sufficient to pay the purchase price of the Facilities.*

*Id.* (emphasis in original).

The developers sued, arguing that the water authority breached this agreement by failing to include a reimbursement provision in each bond election. *Id.* at 834. In response, the water authority argued that it was immune from suit. *Id.* The supreme court, however, held that immunity had been waived pursuant to section 271.152. *Id.* at 836. The court first noted that the "Legislature enacted section 271.152 'to loosen the immunity bar so that *all* local governmental entities that have been given or are given the statutory authority to enter into contracts shall not be immune from suits arising from those contracts.'" *Id.* at 838 (quoting *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 327 (Tex. 2006)) (emphasis in original). The court then turned to the language of section 271.152 and considered whether the contract at issue was one where the essential terms of the agreement provided goods or services to the local governmental entity. *Id.* at 839.

The supreme court noted that chapter 271 "provides no definition for 'services,' despite the Legislature's definition of the term in other contexts." *Id.* It nevertheless concluded that "[i]t appears, generally, that the term is broad enough to encompass a wide array of activities." *Id.* The supreme court cited its holding in *Ben Bolt* as an example:

> In *Ben Bolt*, we liberally construed a government-pooled insurance policy (the "Fund") as encompassing "services" rendered by its members, based on the fact that the Fund's "members elect a governing board, and a board subcommittee

> resolves claims disputes. To that extent, at least, the Fund's members provide services to the Fund."

*Id.* The supreme court thus reasoned that the services provided "need not be the primary purpose of the agreement." *Id.* In looking at the contract at issue, the supreme court concluded that immunity had been waived pursuant to section 271.152:

> We agree with the court of appeals that the Agreements entail services provided directly to the Authority. The Developers contracted to construct, develop, lease, and bear all risk of loss or damage to the facilities, obligations far more concrete than those at issue in *Ben Bolt*, 212 S.W.3d at 327. We therefore hold that the Agreements contemplate the provision of services under the statute.

*Id.* (emphasis added).

In citing *Kirby Lake* for support, WECO emphasizes the supreme court's statement that services need not be the primary purpose of the agreement. Thus, according to WECO, even the option-to-cure provisions in the Agreement, which allow WECO to cure defects or allow the Agreement to terminate, constitute "services" under *Kirby Lake*. However, WECO's interpretation of *Kirby Lake* has the danger of converting every real estate contract into a contract for services – something we do not believe the Legislature intended. In enacting section 271.152, the Legislature specifically stated that it was waiving governmental immunity only for contracts where goods or services are provided to the local governmental entity. *See* TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2005); *see also Bexar Metro. Water Dist. v. Educ. & Economic Dev. Joint Venture*, 220 S.W.2d 25, 31-32 (Tex. App.—San Antonio 2006, pet. dism'd) (explaining contracts for the sale or lease of real estate are not included within section 271.152's waiver of immunity). Had the Legislature intended to waive immunity for all contracts entered into by the State, it would have so stated. *E. Houston Estate Apartments, LLC v. City of Houston*, 294 S.W.3d 723, 736 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also* TEX. GOV'T CODE ANN. § 311.034 (West Supp. 2010) ("In order to preserve the Legislature's interest

in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). Thus, we believe "services" under section 271.152 cannot mean any service – no matter how curative or remote because such an interpretation has the danger of encompassing all contracts.

Under the Agreement, BexarMet has clearly leased a real estate interest from WECO – the right to withdraw groundwater beneath the tracts through wells that already exist, that already have access to groundwater, and that already have received all necessary permits. BexarMet has also leased the wells themselves, well permits, easements, and all other property interests related to the wells. Further, under the Agreement, BexarMet, at its sole cost and expense, is solely responsible for operating, maintaining, repairing, and replacing the Facilities. And, but for the wells it has leased from WECO, it is responsible for constructing all other Facilities. Only if the wells are not capable of producing groundwater in the quantity and quality that was agreed upon by WECO and BexarMet do the option-to-cure provisions come into play. That is, if the property being leased is not usable, or becomes unusable, WECO has the option to either cure the defect or allow BexarMet to terminate the Agreement. Under the facts of this case, we hold that the Agreement's option-to-cure provisions are not sufficient to trigger a waiver of governmental immunity under section 271.152. *See Somerset Indep. Sch. Dist. v. Casias*, No. 04-07-00829-CV, 2008 WL 1805533, at *3 (Tex. App.—San Antonio 2008, pet. denied) (holding that section 271.152 did not waive immunity with respect to the contract because the earnest money contract itself was for the sale of land; the services at issue were a condition to closing); *City of San Antonio v. Reed S. Lehman Grain, Ltd.*, No. 04-04-00930-CV, 2007 WL 752197, at *2 n.2 (Tex. App.—San Antonio 2007, pet. denied) (noting section 271.152 not applicable to claim for breach

of easement dedication contract because it conveyed an interest in real property and was not an agreement for providing goods and services).

Finally, WECO argues that it provides services to BexarMet under Articles 3.03 and 3.08, which provide the following:

**Section 3.03. Lease Agreements.**

(a) WECO represents to the District that: (a) WECO has delivered to the District a full and complete copy of each Lease Agreement; (b) to WECO's current actual knowledge and belief, the Lease Agreements are, as of Effective Date, in full force and effect; and (c) to WECO's current actual knowledge and belief, no event of default has occurred and is continuing [that] would constitute an event of default but for the requirement of the giving of notice and/or the expiration of the period of time to cure.

(b) WECO will keep the Lease Agreements in full force and effect during the term of this Agreement and will not modify the Lease Agreements without the written consent of the District, which consent will not be unreasonably withheld or delayed.

(c) In the event of any act or omission by WECO that causes a default under the terms of a Lease Agreement that would give Lessor the right, either immediately or after the lapse of time, to terminate the Lease in whole or in part, the District will have the right, but not the obligation, to cure such default. Any sums the district pays to a Lessor under this Section shall be credited against the amounts next due to WECO by the District under the terms of this Agreement.

**Section 3.08. Permits.**

(a) Within 90 days following the Facilities Delivery Date for a Tract, [WECO] will obtain all Permits for that Tract and deliver copies of the Permits for that Tract to [BexarMet]. [BexarMet] shall cooperate in the conducting of tests or other operations involving the Wells or the Facilities that are necessary to obtain a Permit for a Well.

(b) [WECO] represents to [BexarMet] that, to the best of its knowledge, each Well meets the following requirements (the "Exemption Requirements"): (i) the Well was in existence on September 1, 2001; or (ii) the TCEQ has approved plans submitted for the installation of the Well before September 1, 2001, and the installation of the Well was completed in accordance with the approved plans and the TCEQ's technical requirements before September 1, 2002. If it is determined that a Well does not meet either of the two Exemption Requirements, then [WECO] shall be responsible for the payment of any additional production fees or

substitute groundwater production taxes imposed by a Groundwater District as a result of such Well's failure to meet the Exemption Requirements. The amount of the additional fees or taxes shall be credited against any amounts due to [WECO] for the Tract on which such Well is located under Article V.

WECO argues that these sections require it to maintain and abide by the terms of its leases during the term of the Agreement, including "paying royalties to WECO's lessors and performing other services." According to WECO, "[b]ut for WECO's lease-maintaining services, BexarMet would lose this supply of water for its customers." However, when one is subleasing any real estate interest to a third party, one would necessarily be required to maintain one's own primary lease. And, when one is leasing wells like the wells at issue, one would necessarily have to show that one has permits for such wells. Thus, like the option-to-cure provisions in the Agreement, holding that such provisions constitute "services" under section 271.152 would have the danger of converting every contract subleasing a real estate interest into a contract for services.

We hold that because the Agreement does not constitute a "contract stating the essential terms of the agreement for providing . . . services to the local governmental entity," TEX. LOC. GOV'T CODE ANN. § 271.151(2) (West 2005), governmental immunity has not been waived pursuant to section 271.152, *see id.* § 271.152. And, because there has been no waiver of governmental immunity pursuant to section 271.152, we affirm the trial court's order granting BexarMet's plea to the jurisdiction.[3]

Karen Angelini, Justice

---

[3] Having determined that governmental immunity was not waived under section 271.152, we need not reach BexarMet's cross point.