

# NUMBER 13-13-00340-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**PARTNERS DEWATERING INTERNATIONAL, L.C.,**  **Appellant,**

**v.**

**CITY OF RIO HONDO,**  **Appellee.**

## On appeal from the 445th District Court
## of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza**
**Memorandum Opinion by Justice Rodriguez**

This accelerated, interlocutory appeal involves the grant of a plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West, Westlaw through 2013 3d C.S.). Appellant Partners Dewatering International, L.C. (PDI) filed a breach of contract claim against appellee the City of Rio Hondo. In response, Rio Hondo

filed a plea to the jurisdiction asserting immunity. *See* TEX. LOC. GOV'T CODE ANN. § 271.152 (West, Westlaw through 2013 3d C.S.). The trial court sustained the plea. By a single issue, PDI contends that the trial court erred in granting Rio Hondo's plea to the jurisdiction. We reverse and remand.

## I.    Background

### A.    The Agreement

In 2008, PDI and Rio Hondo entered into an operating lease agreement (the Agreement) for a liquid waste de-watering facility or a Type V-GG facility (the Facility). *See* 30 TEX. ADMIN. CODE § 330.5(a)(3) (providing for a Type V Municipal Solid Waste (MSW) Facility that is described as a "[s]eparate solid waste processing facility" including "processing plants that transfer, incinerate, shred, grind, bale, salvage, separate, *dewater*, reclaim, and/or provide other storage or processing of solid waste") (emphasis added). The Facility was to be located on the grounds of Rio Hondo's Waste Water Treatment Facility, also referred to as the Waste Water Treatment Plant (WWTP).[1] As set out in the Agreement, PDI requested and Rio Hondo agreed to permit PDI "to establish, operate and maintain the Facility "for the purpose of treating grease, grit, and septage."[2] At its "sole cost, risk and expense," PDI would "obtain a required registration, install and operate" the Facility.

---

[1] Each party attached a copy of the "Operating Lease Agreement for Liquid Waste De-Watering Facility" as relevant evidence supporting the pleadings before the trial court, including Rio Hondo's plea to the jurisdiction and PDI's response to the plea. *See City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009).

[2] Section 330.9(g) of title 30 of the Texas Administrative Code provides, in relevant part, for the following Type V registration:

2

Pursuant to the Agreement, the WWTP would accept "water and wastewater treatment sludges, organic non-hazardous industrial sludges, and chemical toilet wastes,"[3] and Rio Hondo would provide PDI, "when available, activated sewer sludge generated by [Rio Hondo] for the purpose of mixing said sludge with the collected waste in order to facilitate the separation of solids from liquids"—which, both parties acknowledged, was the de-watering process. Processing and disposing of this activated sludge was to "be at the sole cost, risk and expense of [PDI]." And PDI was "solely responsible for disposing of any byproduct resulting from the [d]e-[w]atering process."

The Agreement addressed modifications and improvements,[4] setting out, among other things, that PDI was not to expend funds in excess "of $10,000.00 for material and equipment for the mutually agreed improvements to [Rio Hondo's] WWTP." The Agreement described this expenditure for modifications as additional consideration—an amount to be paid "[i]n addition to the consideration" Rio Hondo charged PDI for effluent discharge that is discussed below. Yet the Agreement provided that "[a]ll modifications [were] owned by [PDI]," and at PDI's option, the modifications would be returned to PDI. In addition, PDI was to return the property to its "original condition as much as possible"

---

[A] registration is required for an MSW Type V processing facility that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes . . . . For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators.

30 TEX. ADMIN. CODE § 330.9(g).

[3] The Solid Waste Disposal Act defines "sludge" as "solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility, excluding the treated effluent from a wastewater treatment plant." TEX. HEALTH & SAFETY CODE ANN. § 361.003(33) (West, Westlaw through 2013 3d C.S.).

[4] The parties use "modifications" and "improvements" interchangeably.

3

upon termination of the Agreement. Finally, because the Agreement restricted the Facility's business traffic to a specific access road, PDI was also "required to construct and maintain at its sole cost, risk and expense a road surface from the point of entry [off of Reynolds Street] to the loading and unloading point of the Facility."

The monitoring of the Facility was to be in a manner approved by Rio Hondo to verify that the Facility's operations complied with State and Federal regulations. The Agreement provided the following:

> All WWTP effluent sampling will be conducted by [PDI] and delivered to an approved laboratory with the cost of analysis to be borne by [Rio Hondo]. All sampling requirements as set out in the Type V[-]GG . . . registration will be at the sole cost, risk and expense of [PDI].

Regarding consideration, Rio Hondo agreed to allow PDI "to discharge treated effluent from the [d]e-[w]atering process into [the WWTP] for treatment." For the effluent discharge, PDI agreed to pay Rio Hondo "$0.01 per gallon of waste as manifested being received at the de-watering facility and $0.003125 as manifested and received at the WWTP but in no event will [Rio Hondo] receive less than a minimum of $1,500.00 per month." The Agreement referred to this payment as the monthly amount PDI agreed to pay Rio Hondo for the lease of its property for the Facility on the grounds of the WWTP. The last sentence of this paragraph also set out that "[a]ll sludge generated by the WWTP will be collected, hauled and disposed [of] at the sole cost[,] risk[,] and expense of [PDI]."

## B.     PDI Sued Rio Hondo for Breach of Contract

In February 2013, the governing body of Rio Hondo voted to terminate the Agreement. PDI claimed that it had not materially defaulted and requested that the parties arbitrate the matter. When Rio Hondo did not respond to PDI's arbitration

4

demand, PDI sued Rio Hondo for breach of contract. In its petition, PDI alleged that because the Agreement required PDI to provide Rio Hondo with goods and services, Rio Hondo waived its immunity from suit.[5] *See* TEX. LOC. GOV'T CODE ANN. § 271.152. PDI sought damages on its breach of contract claim including "the balance due and owed by [Rio Hondo] under the contract." *See id.* § 271.153 (West, Westlaw through 2013 3d C.S.). Rio Hondo filed a plea to the jurisdiction claiming it retained its immunity because the Agreement "is a straight operating lease agreement for a liquid waste de-watering facility" with "no special services provided or associated with this [c]ontract." The trial court granted Rio Hondo's plea to the jurisdiction, and PDI filed this accelerated, interlocutory appeal.

## II.     Standard of Review

A plea to the jurisdiction is a dilatory plea; its purpose is "to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea challenges the trial court's jurisdiction over the subject matter of a pleaded cause of action. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Parks & Wildlife Dep't v. Morris*, 129 S.W.3d 804, 807 (Tex. App.—Corpus Christi 2004, no pet.). Subject matter jurisdiction is a question of law; therefore, an appellate court reviews de novo a trial court's ruling on a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 226; *Morris*, 129 S.W.3d at 807.

A plea to the jurisdiction can make two types of challenges—to the pleadings or to

---

[5] Although PDI generally contends that it provided "goods and services" to Rio Hondo, its argument on appeal discusses only PDI's alleged provision of "services." PDI does not develop any contention regarding "goods" provided to Rio Hondo. Accordingly, we do not consider whether PDI provided "goods" to Rio Hondo.

the existence of jurisdictional facts. *See Miranda*, 133 S.W.3d at 226–28. When a trial court bases its decision concerning a plea to the jurisdiction on the plaintiff's pleadings, we construe the pleadings liberally in favor of the plaintiff, accepting as true all factual allegations in the pleadings and looking to the pleader's intent, to determine if the plaintiff met his burden to plead facts sufficient to confer jurisdiction on the court. *Id.* at 226; *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *Morris*, 129 S.W.3d at 807. If the pleadings neither affirmatively demonstrate nor negate jurisdiction, the plaintiff should be given an opportunity to amend the pleadings. *City of Waco v. Kirwan,* 298 S.W.3d 618, 622 (Tex. 2009). When a plea to the jurisdiction challenges the existence of jurisdictional facts, as here, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues that are raised. *Id.* (citing *Miranda*, 133 S.W.3d at 227); *see also City of Corpus Christi v. Scorpio Development, LLC*, No. 13-13-00445-CV, 2014 WL 1007880, at *2 (Tex. App.—Corpus Christi Mar. 13, 2014, no pet.) (mem. op.). If that evidence creates a fact question regarding the jurisdictional issue, then the district court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Kirwan,* 298 S.W.3d at 622; *Miranda,* 133 S.W.3d at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Miranda*, 133 S.W.3d at 228.

Here, the parties do not dispute the language or content of the Agreement, which both attached to their pleadings. So we review whether the Agreement is a contract providing services to Rio Hondo as a question of law. *See MCI Telecomms. Corp. v.*

6

*Tex. Utils. Elect. Co.*, 995 S.W.2d 647, 650 (Tex. 1999) (providing that construction of an unambiguous contract is a question of law for the court); *Water Exploration Co., Ltd., v. Bexar Metro. Water Dist.* 345 S.W.3d 492, 495 (Tex. App.—San Antonio 2011, no pet.).

### III.     Applicable Law

Rio Hondo is a local governmental entity. *See* TEX. LOC. GOV'T CODE ANN. § 271.151(3)(A) (West, Westlaw through 2013 3d C.S.).

> Local governmental entities "enjoy governmental immunity from suit, unless immunity is expressly waived." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 836 (Tex. 2010). Governmental immunity includes both immunity from liability, "which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). A governmental entity that enters into a contract "necessarily waives immunity from liability, voluntarily binding itself like any other party to the terms of agreement, but it does not waive immunity from suit." *Id.* Unlike immunity from liability, immunity from suit deprives the courts of jurisdiction and thus completely bars the plaintiff's claim. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003).

*Lubbock County Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 300 (Tex. 2014).[6]

Section 271.152 of the local government code "provides a limited waiver of immunity for local governmental entities that enter into certain contracts." *Id.* at 301 (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 412 (Tex. 2011); *Kirby Lake*, 320 S.W.3d at 838 (stating that the statute "waives immunity from suit for certain contract claims")). This waiver applies only to contracts that are in writing, are properly executed, and state "the essential terms of the agreement for providing goods

---

[6] The Texas Supreme Court decided *Lubbock County Water Control & Improvement District v. Church & Akin* after the trial court made its ruling in this case. *See generally* 442 S.W.3d 297 (Tex. 2014).

7

or services to the local governmental entity." TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A); *Church & Akin*, 442 S.W.3d at 301. And waiver applies "regardless of the document's title and even if the provision of goods and services is not the primary purpose of the contract." *Id.* at 302.

While section 271 does not define the term "services," the Texas Supreme Court has held that, in the context of section 271.152, the term "is broad enough to encompass a wide variety of activities." *Id.* (quoting *Kirby Lake*, 320 S.W.3d at 839); *see also City of Alamo v. Osuna*, No.13-13-00317-CV, 2014 WL 6602387, at *4 (Tex. App.—Corpus Christi Nov. 20, 2014, no pet.) (memo. op.). "The term 'includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed.'" *Church & Akin*, 442 S.W.3d at 303 (quoting *Kirby Lake*, 320 S.W.3d at 839). In other words, "there must be some obligation to perform." *Kirby Lake*, 320 S.W.3d at 839. The services must be provided directly to the governmental entity, *see id.* at 838, and "would not extend to 'contracts in which the benefit that the local governmental entity would receive is an indirect, attenuated one.'" *Church & Akin*, 442 S.W.3d at 303 (citing *Kirby Lake*, 320 S.W.3d at 839 (quoting *Berkman v. City of Keene*, 311 S.W.3d 523, 527 (Tex. App.—Waco 2009, no pet.) (op. on reh'g))). "[T]he absence of any agreement by the governmental entity to pay for goods or services may indicate that the claimant[, PDI in this case,] did not in fact agree to provide goods or services to the governmental entity." *Church & Akin*, 442 S.W.3d at 305; *see also City of Alamo*, 2014 WL 6602387, at *3. Yet in some instances a party may agree to provide services in exchange for something other than payment. *Church*

8

*& Akin*, 442 S.W.3d at 305; *see also City of Alamo*, 2014 WL 6602387, at *3.

## IV. Discussion

By a single issue, PDI challenges the trial court's granting of Rio Hondo's plea to the jurisdiction, arguing that section 271.152's waiver of immunity from suit applies to the Agreement because PDI provided services to Rio Hondo. Rio Hondo disagrees. The principal dispute then in this appeal is whether the parties' agreement includes an "agreement for providing . . . services [to Rio Hondo]." *See* TEX. LOC. GOV'T CODE ANN. § 271.152(1)(A).

PDI argues that Rio Hondo waived its immunity because the Agreement obligated PDI to perform services related to: (1) satisfying Rio Hondo's regulatory obligations under the Texas Administrative Code; (2) making renovations to the WWTP; and (3) obtaining a specialized Type V-GG registration from the Texas Commission on Environmental Quality (TCEQ).[7] PDI claims that all of these alleged services were "critical to the improved operation and benefit of Rio Hondo's existing [WWTP]." We address each argument in turn.

### A. "Services" Related to Satisfying Rio Hondo's Regulatory Obligations

Specifically, PDI asserts that it provided services involving the processing and disposal of sludge, *see* 30 TEX. ADMIN. CODE § 312 (providing for sludge use, disposal, and transportation), the sampling, monitoring, and reporting of effluent, *see id.* §§ 309.1– .4 (setting out effluent limitations); *id.* § 319.1 (discussing effluent monitoring and

---

[7] Although PDI indicates that it applied for a Type V-GG permit, it appears from our review that PDI sought to register the Facility with the Texas Commission on Environmental Quality. PDI filed its application under section 330.9, which requires registration, not a permit. *See* 30 TEX. ADMIN. CODE ANN. § 330.9.

9

reporting requirements); and the controlling of odor, *see id.* § 309.13 (describing unsuitable site characteristics, including the control of a nuisance of odor).

### 1. Rio Hondo's Sludge

#### a. Activated Sludge

Rio Hondo agreed to provide PDI with its "activated sewer sludge," when available, to facilitate PDI's de-watering process. Because PDI was to bear the cost, risk, and expense of processing and disposing of this activated sewer sludge, PDI claims that it provided a service to Rio Hondo. But PDI's processing and disposing of this sludge directly benefited PDI's de-watering process. At best, it only indirectly benefited Rio Hondo. *See Church & Akin*, 442 S.W.3d at 305; *Kirby Lake*, 320 S.W.3d at 838–39. Under this provision of the Agreement, we cannot conclude that PDI provided services to Rio Hondo.

#### b. All Sludge Generated by the WWTP

The Agreement also provided that PDI, at its sole cost, risk, and expense, would collect, haul, and dispose of "[a]ll sludge generated by the WWTP." By this provision, PDI claims it provided a service to Rio Hondo.

Unlike the provision directing PDI to process and dispose of activated sludge used to facilitate its de-watering process, this provision set out that PDI was to collect, haul, and dispose of all sludge that WWTP generated. So by this language, the Agreement identified an act to be performed by PDI for the direct benefit of Rio Hondo. *See Church & Akin*, 442 S.W.3d at 303; *Kirby Lake*, 320 S.W.3d at 839. PDI obligated itself to perform this service that directly benefited Rio Hondo. *See Church & Akin*, 442 S.W.3d

10

at 305; *see also Kirby Lake*, 320 S.W.3d at 839. This was not an indirect or attenuated benefit to Rio Hondo. *See Church & Akin*, 442 S.W.3d at 303; *Kirby Lake*, 320 S.W.3d at 839. We conclude that by this activity, PDI provided a service to Rio Hondo.

The Agreement, however, provided for no payment by Rio Hondo to PDI for the service. *See Church & Akin*, 442 S.W.3d at 305; *see also City of Alamo*, 2014 WL 6602387, at *3. Instead, the Agreement set out that PDI was to absorb the cost, risk, and expense of collecting, hauling, and disposing of all sludge generated by the WWTP. So we must determine if this is an instance where a party may have agreed to provide a service in exchange for something other than payment. *See Church & Akin*, 442 S.W.3d at 305; *see also City of Alamo*, 2014 WL 6602387, at *3.

Rio Hondo and PDI placed this language at the end of the Agreement's lease payment provision. This suggests that the parties considered the value of this service to Rio Hondo in arriving at PDI's monthly lease payment. The value of PDI's actions may have been part of the payment calculation, rather than Rio Hondo paying PDI directly. Although the actual meaning of this provision seems less than clear, we cannot conclude, in this case, that because the Agreement did not reflect a payment from Rio Hondo to PDI for this service, PDI did not in fact agree to provide this service to Rio Hondo. *Cf. Church & Akin*, 442 S.W.3d at 305; *City of Alamo*, 2014 WL 6602387, at *3.

This provision sets out an essential term of the Agreement for a service to be rendered to Rio Hondo. *See Church & Akin*, 442 S.W.3d at 301; *Kirby Lake*, 320 S.W.3d at 839. Even though the service provided did not address the Agreement's primary purpose, we conclude that the Agreement's requirement regarding the collecting, hauling,

11

and disposing of all sludge generated by the WWTP constituted a service under the statute. So Rio Hondo waived immunity to suit. *See Kirby Lake*, 320 S.W.3d at 839; *see also* TEX. LOC. GOV'T CODE ANN. § 271.151(2).

**2.    Effluent**

PDI also contends that its obligation to conduct all of WWTP's effluent sampling and to deliver the samples to an approved laboratory for analysis constituted a service to Rio Hondo. However, Rio Hondo was to pay for any costs related to the analysis of the effluent samples for the WWTP. And PDI was responsible for "the sole cost, risk and expense" related to all sampling requirements for PDI's Type V-GG registration. While Rio Hondo may have benefited from PDI conducting the effluent sampling and delivering those samples to the laboratory, we can only conclude that those benefits were indirect in light of PDI, itself, directly benefiting from monitoring its Facility and satisfying its own requirements under the Type V-GG registration. And there is nothing in the Agreement that would support a conclusion that Rio Hondo agreed to pay PDI to collect and deliver the effluent samples, which indicates, in this instance, that PDI did not agree to provide this service to Rio Hondo. *See Church & Akin*, 442 S.W.3d at 305. Finally, this language is found in a paragraph titled, "Monitoring of the Facility." As part of its obligation under the Agreement, PDI monitored its Facility to verify that its operations complied with all State and Federal regulations and the requirements or limits of Rio Hondo's EPA and TECQ permits. Accordingly, we cannot conclude that the Agreement's provisions regarding effluent sampling evidenced a service to Rio Hondo.

**3.    Odors and Contaminants**

12

PDI further contends that it provided a service to Rio Hondo by agreeing to "control and contain any odor and contaminants, if any, within the WWT[P]." PDI argues that this alleged service directly benefited Rio Hondo because it satisfied one of Rio Hondo's regulatory obligations as a "permitee of a Waste Water Treatment Facility." However, the Agreement provides, in its entirety, the following:

> [PDI] further agrees that the Facility will be constructed so as to contain any spillage and [PDI] shall assume all liability for any spillage that may occur. [PDI] will control and contain any odor and contaminants, if any, within the WWT Plant, and such odors or contaminants shall not be at a level to cause any harm, danger or destruction to any person or property. Nor will any odor be at a level that would offend any reasonable person with a normal sense of smell.

When read in context, the odor and contaminants discussed in this paragraph do not refer directly to Rio Hondo's regulatory obligations as permitee of the WWTP. Instead, this portion of the paragraph titled "Establishment, Operation[,] and Maintenance of the Facility," refers to PDI's agreement to contain spillage at its Facility and to control and contain any odor and contaminants within the WWTP that involve its Facility; the Agreement simply addressed restrictions on PDI's operation of the Facility. At best, this referenced odor and contamination control would only indirectly benefit Rio Hondo. We cannot conclude that the Agreement's provisions regarding odors constituted a service to Rio Hondo.

## B. "Services" Related to Modifications/Improvements

PDI contends that by agreeing to make certain renovations to the WWTP, it provided a service to Rio Hondo. PDI claims that the Agreement

> provides a significant benefit to Rio Hondo as it calls for PDI to make improvements to Rio Hondo's [WWTP]. While Rio Hondo argues that such

13

improvements are of no benefit to Rio Hondo because they are removable, this argument overlooks that the returning of [the] premises to an original condition . . . is in and of itself, an additional service to Rio Hondo that is provided for under the Agreement.

PDI identifies the following, which it claims are services: (1) expending funds not to exceed $10,000 for mutually agreed improvements to the WWTP; (2) constructing and maintaining a road on Rio Hondo-owned property; and (3) installing and operating a liquid waste de-watering facility on the grounds of the WWTP. In response, Rio Hondo argues that all construction, modifications, and improvements, including the road, were not for the benefit of Rio Hondo, but for PDI's own operation of its business. We agree with Rio Hondo.

First, the Facility was to be installed and operated at PDI's "sole cost, risk and expense." The de-watering equipment was owned by PDI and was to be promptly removed "[s]hould [PDI] cease to operate the de-watering system for its intended purpose." The Agreement similarly provided that PDI owned all modifications and that, at PDI's option, they would be returned to PDI upon the termination of the Agreement. Second, the modifications or improvements to the Facility directly benefited PDI because the expenditure of funds to improve the WWTP, the construction and maintenance of the road, and the installation and operation of the de-watering facility facilitated the operation of PDI's business. PDI paid for and owned all equipment and modifications. Upon termination of the Agreement, "[t]he property [was] to be returned to the original condition as much as possible by [PDI]" through the removal and return of equipment and modifications to PDI, which again provided a benefit to PDI, not Rio Hondo. And absent from the contract was any agreement by Rio Hondo to pay PDI for any modifications or

14

for the return of the property to its original condition, which we conclude, in this instance, indicates that PDI did not agree to provide this as a service to Rio Hondo. *See Church & Akin*, 442 S.W.3d at 305.

PDI also agreed to construct and maintain a road for the Facility's business traffic, from "the point of entry [onto WWTP's property] to the loading and unloading point of the Facility." This road was to "include an area for the parking of [PDI's] equipment and trucks." We conclude that PDI's act of building this road did not provide a service directly to Rio Hondo. *See Kirby Lake*, 320 S.W.3d at 839. The road provided a direct benefit to PDI, allowing ingress and egress to the Facility for its business traffic. It also provided a parking area for PDI's equipment and trucks. While the road would likely have remained on the property upon termination of the Agreement, we conclude that Rio Hondo would only have received an indirect, attenuated benefit from its construction and its use. *See Church & Akin*, 442 S.W.3d at 303 (citing *Kirby Lake*, 320 S.W.3d at 839).

PDI relies on *Hoppenstein Properties, Inc. v. McLennan County Appraisal District*, for the proposition that a "lease" has been held to waive immunity from suit under section 271.152 if it involves the provision of goods or services to a governmental entity. *See* 341 S.W.3d 16, 20 (Tex. App.—Waco 2010, pet. denied) (op. on reh'g). We agree with the basic premise, but do not agree that *Hoppenstein* supports PDI's argument regarding the lease agreement in this case.

In *Hoppenstein*, the McLennan County Appraisal District (MCAD) leased office space in a building owned by Hoppenstein. *See id.* at 19 n.2. The Waco Court concluded that under the lease, "Hoppenstein contracted to renovate the [leased]

15

premises for MCAD.   Thus, the lease [with a construction contract addendum] entails the provision of services to MCAD within the meaning of the statute."   *Id.* (citing *Kirby Lake*, 320 S.W.3d at 832, 839) (concluding immunity was waived when a Water Authority entered into a contract that stipulated "that the Developers would build water and sewer facilities according to the Authority's specifications [with 70% reimbursement upon voter approval of bond funds], and that the Developers would lease the facilities to the Authority free of charge until the Authority purchased them").   In other words, the *Hoppenstein* Court found that an agreement for renovation of office space for the government constituted services to the government entity, which waived immunity.   *See id.* *Hoppenstein* does not apply to the facts of this case where PDI agreed to make modifications to the WWTP for its own Facility; modifications that we have concluded were not for the government but for PDI's benefit.   Therefore, PDI's reliance on *Hoppenstein* is misplaced.

In sum, based on the above, we cannot conclude that the Agreement's provisions addressing modifications, construction, or renovations stated a service provided directly to Rio Hondo under the Agreement.

## C.   "Services" Related to Obtaining a Type V-GG Registration from the TCEQ

Finally, PDI claims that it provided a service to Rio Hondo because it was obligated under the Agreement to obtain a specialized registration from the TCEQ called a "Type V-GG."   *See* 30 TEX. ADMIN. CODE §§ 330.9(g), 330.57(a–b) (providing the procedure for a permit application or for a registration application, which follows the same process but is not subject to a hearing request or to any administrative completeness determinations).

PDI argues "[t]his specialized [registration] would provide a significant benefit to Rio Hondo's Waste Water Treatment Facility as it would elevate what type of product could be appropriately handled there," suggesting that Rio Hondo's revenues would increase.

Although Rio Hondo might have received some benefit from the issuance of the registration for a Type V Liquid Waste Processing Facility (Type V-GG), it is PDI that directly benefited from its issuance. PDI needed the registration before it could open the Facility. By the Agreement, PDI, not Rio Hondo, bore the responsibility of applying for the Type V-GG registration. *See id.* § 330.57(b). PDI also bore the costs related to the filing of the MSW registration application. And the Agreement did not suggest that Rio Hondo was to pay PDI for registering the Facility. Finally, there is nothing in the Agreement or the record to support PDI's contention that obtaining a Type V-GG registration would have provided a direct benefit to Rio Hondo by increasing its revenue. *See Church & Akin,* 442 S.W.3d at 306–07 (concluding that nothing in the lease or the record substantiated the implication that an increase in marina traffic through Church & Akin's sale of catering tickets would benefit the Water District). So we cannot conclude that the Agreement's provision requiring PDI to obtain the Type V-GG registration from the TCEQ stated a service to Rio Hondo.

**D.    Summary**

We conclude that the following does not constitute the provision of services directly to Rio Hondo under the Agreement: (1) processing and disposing of Rio Hondo's activated sludge to facilitate PDI's de-watering process; (2) conducting effluent sampling and delivering the samples to an approved laboratory for analysis; (3) controlling and

17

containing any odor and contaminants; (4) making renovations or modifications to the Facility; and (5) obtaining a Type V-GG registration.   We do conclude that PDI agreed to provide a service to Rio Hondo by collecting, hauling and disposing "[a]ll sludge generated by the WWTP."   The trial court erred in granting Rio Hondo's plea to the jurisdiction because the Agreement contemplates the provision of this service to Rio Hondo under the statute.   *See Kirby Lake*, 320 S.W.3d at 839.   We sustain PDI's issue only on this basis and overrule it on all other services claimed.

## IV.    Conclusion

We reverse the order of the trial court granting Rio Hondo's plea to the jurisdiction and remand this cause to the trial court for further proceedings consistent with this opinion.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
11th day of June, 2015.